**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

RICHARD ROSARIO,

               Plaintiff,

   -against-

THE CITY OF NEW YORK; GARY
WHITAKER, IRWIN SILVERMAN,
CHARLES CRUGER, JOSEPH
FORTUNATO, RICHARD MARTINEZ,


               Defendants.

18-cv-4023 (LGS)

**February 21, 2020**


**Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment**

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

STANDARD OF REVIEW ................................................................................................. 3

FACTS ................................................................................................................................. 3

   I.   Richard Rosario is innocent of the murder of the murder of George Collazo. ................ 3

   II.   After Defendants initially fail to identify a suspect, Defendant Silverman suggests
      Rosario. ................................................................................................................. 4

   III.   Defendants Whitaker, Martinez, and Silverman use suggestion to get Robert Davis to
      identify Rosario. ................................................................................................... 6

   IV.   Defendants Cruger, Martinez, and Whitaker use suggestion to get Michael Sanchez to
      identify Rosario. ................................................................................................... 6

   V.   Defendants Martinez and Whitaker fabricate an identification with Jose Diaz. .............. 7

   VI.   Defendants Whitaker and Martinez bury exculpatory information from Nicole Torres... 8

   VII.   Defendants bury other exculpatory information. ............................................... 9

   VIII.  Defendants in bad faith fail to investigate Rosario's alibi. ........................................ 10

   IX.   Rosario is wrongly convicted based on Davis and Sanchez's false identifications. ....... 12

   X.   Twenty years later, Rosario is exonerated....................................................................... 13

ARGUMENT ...................................................................................................................... 13

   I.   Defendants systematically deprived Plaintiff of a fair trial............................................ 13

      A.   Defendants suppressed exculpatory evidence................................................. 14

      B.   Defendants fabricated false reports concerning the eyewitness identifications.......... 25

      C.   Defendants obtained the identifications through impermissible suggestion............... 27

      D.   Defendants are not entitled to qualified immunity for their fair trial violations........ 30

   II.   Defendants maliciously prosecuted Plaintiff.................................................................. 30

      A.   Defendants lacked probable cause. ................................................................. 31

      B.   The prosecution terminated in Plaintiff's favor. ............................................ 32

      C.   Defendants initiated the prosecution against Plaintiff. ................................... 34

      D.   Malice can be inferred from a lack of probable cause. ................................... 34

      E.   Defendants are not entitled to qualified immunity for their malicious prosecution of
          Plaintiff. ........................................................................................................... 34

   III.   There is no basis to dismiss Plaintiff's respondeat superior claim.................................. 35

   IV.   There is no basis to dismiss Plaintiff's failure to intervene claims. ............................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anilao v. Spota*, 918 F. Supp. 2d 157 (E.D.N.Y. 2013) .................................................. 31

*Bellamy v. City of New York*, 914 F.3d 727 (2d Cir. 2019) ................................... passim

*Bermudez v. City of New York*, 790 F.3d 368 (2d Cir. 2015) ................................. passim

*Binder & Binder PC v. Barnhart*, 481 F.3d 141 (2d Cir. 2007) ............................... 3, 24

*Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) ........................................... 31, 34

*Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001) ....................................................... 18, 23

*Buchy v. City of White Plains*, 14 CV 1806 (VB),
   2015 WL 8207492 (S.D.N.Y. Dec. 7, 2015) ............................................................ 35

*Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 CIV. 9931 (WHP),
   2009 WL 3364036 (S.D.N.Y. Oct. 16, 2009) ......................................................... 28

*Chimurenga v. City of New York*, 45 F. Supp. 2d 337 (S.D.N.Y. 1999) ..................... 34

*Colon v. City of New York*, 60 N.Y.2d 78 (1983) ......................................................... 31

*Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30 (2d Cir. 2019) ............................... 3

*Dickerson v. Fogg*, 692 F.2d 238 (2d Cir. 1982) .......................................................... 28

*Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126 (2d Cir. 1997) .................................... 28

*Dufort v. City of New York*, 874 F.3d 338 (2d Cir. 2017) ........................... 16, 25, 32, 35

*Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016) ..................... 25, 30

*Gelb v. Bd. of Elections*, 224 F.3d 149 (2d Cir. 2000) .................................................. 24

*Haynes v. City of New York*, 815 N.Y.S.2d 143 (2d Dep't 2006) .................................. 31

*In re Dana Corp.*, 574 F.3d 129 (2d Cir. 2009) ....................................................... 3, 20

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ......................................... 27

*Jackson v. Fogg*, 589 F.2d 108 (2d Cir. 1978) ............................................................. 14

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) ........................................... 25

*Kampshoff v. Smith*, 698 F.2d 581 (2d Cir. 1983) ........................................................ 20

*Kyles v. Whitley*, 514 U.S. 419 (1995)........................................................... 14, 23, 24

*Lanning v. City of Glens Falls*, 908 F.3d 19 (2d Cir. 2018) ........................................ 32

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) ......................................................... 18

*Lewis v. Comm'r of Corr.*, 790 F.3d 109 (2d Cir. 2015) ............................................. 19

*Lowth v. Town of Cheektowaga*, 82 F.3d 563 (2d Cir. 1996) ..................................... 31

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010)...................... 30, 31, 34

*McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006)....................................................... 31

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) .......................................................... 23

*Morse v. Fusto*, 804 F.3d 538 (2d Cir. 2015) ...................................................... 25, 30

*Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997) ...................................................... 32, 33

*People v. Pichardo*, 1 N.Y.3d 126 (2003) ................................................................. 29

*Pinsky v. Duncan*, 79 F.3d 306 (2d Cir. 1996) .......................................................... 34

*Poventud v. City of New York*, 07-cv-3998,
   2015 WL 1062186 (S.D.N.Y. Mar. 9, 2015) ........................................................ 30

*Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014) (en banc) ........................ 14

*Raheem v. Kelly*, 257 F.3d 122 (2d Cir. 2001) .......................................................... 28

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)............................. 20

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017)............................................ 22, 24

*Ricciuti v. N.Y.C. Transit. Auth.*, 124 F.3d 123 (2d Cir. 1997)............................... 25, 30

*Smith v. Cain*, 565 U.S. 73 (2012) ...................................................................... 18, 23

*Spak v. Phillips*, 857 F.3d 458 (2d Cir. 2017)............................................................ 33

*Stansbury v. Wertman*, 721 F.3d 84 (2d Cir. 2013) ............................................. 16, 32

*United States v. Fernandez*, 456 F.2d 638 (2d Cir. 1972) .......................................... 27

*Vazquez v. City of New York*, No. 10-cv-6277(JMF),
  2014 WL 4388497 (S.D.N.Y. Sept. 5, 2014)............................................................ 31

*Walker v. City of New York*, 974 F.2d 299 (2d Cir. 1992)........................................... 30

*Walker v. Sankhi*, 494 Fed. App'x 140 (2d Cir. 2012) ............................................... 29

*Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000) .......................................................... 30

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................... 3

Fed. R. Civ. P. 56(d) .................................................................................................... 31

Fed. R. Civ. P. 8(d) ...................................................................................................... 35

**Treatises**

Restatement (Second) of Torts..................................................................................... 33

## INTRODUCTION

Richard Rosario spent nearly 20 years wrongly imprisoned for a murder he did not commit, the 1996 Bronx shooting of Jorge "George" Collazo. After a reinvestigation personally ordered by the Bronx District Attorney unearthed irrefutable evidence of Rosario's innocence, he was freed; he brought this 42 U.S.C. § 1983 suit to hold accountable the NYPD Detectives who caused his wrongful conviction. The City moved to dismiss the suit in full, but this Court found Rosario's legal claims viable. And discovery has substantiated the allegations raised in Plaintiff's Complaint while also uncovering additional misconduct unknown at the time of pleading.

At the time of the prosecution, Defendants claimed three separate witnesses had each independently selected Rosario's photo from among hundreds of other photos of young Hispanic men in mugbooks. If that were true, it would be extraordinary validation of the reliability of these stranger identifications—which were the only evidence implicating Rosario in the crime. But the truth was the opposite: Defendants used blatant suggestion to obtain the identifications. Indeed, given Rosario's innocence, what Defendants describe in the identification procedures is a near impossibility. In a case built solely on identifications, *none* of the witnesses deposed describe identification procedures that match what Defendants reported.

In particular, Robert Davis, one of only two witnesses to identify Rosario at trial, testified at his deposition that while Defendants showed him mugbooks (including one with Rosario's photo in it), he did not identify anyone from those books. Instead, after he failed to make any identification from mugbooks, Defendants showed him two or three loose photos from which he selected Rosario. And the evidence establishes those two to three photos were either (1) multiple different photos of Rosario or (2) photos of only Rosario and an unidentified black man (when the shooter was known to be light-skinned). It is beyond dispute that this procedure was impermissibly suggestive, and that Defendants hid this from the prosecutor and court. Indeed,

Defendants expressly claimed that Davis had selected Rosario from the very mugbook from which he had failed to make an identification—and even photocopied the page from which they falsely claimed he had made his selection. This alone deprived Rosario of a fair trial.

But there's more. Nicole Torres, a friend of Collazo, witnessed the shooting. She told Defendants that it was a planned hit, with the shooter saying "Hey George, this is for you" immediately before shooting Collazo in the head and then jumping into a waiting getaway car. This information exculpated Rosario, because it is undisputed Rosario did not know Collazo and had no prior connection to him. The prosecution theory at trial was that the shooting arose out of a brief interaction on the street moments earlier: "because of a bump in the street and nothing more." Defendants also conducted a blatantly suggestive identification procedure with Torres—showing her a single photo of Rosario and asking if he was the shooter—but she told them she did not recognize him. None of this exculpatory information from Torres was reported to the prosecutor or known at Rosario's trial. The only police reports regarding Torres falsely represented that she had not witnessed the shooting at all. This, too, is independently sufficient to prove Defendants deprived Rosario of a fair trial.

And even that is not all. The record evidence establishes police misconduct infected every aspect of the investigation, from other undisclosed suggestive identification procedures to a bad-faith failure to investigate Rosario's detailed alibi, which established he was in Florida, over 1,000 miles away, at the time of the crime. Defendants' motion credits their own evidence and draws inferences in their favor, which they may not do on their motion for summary judgment. Their motion should be denied; this case must be decided at trial.[1]

---

[1] Plaintiff voluntarily dismisses his claims against Joseph Fortunato.

## STANDARD OF REVIEW

Summary judgment is improper unless Defendants show there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007). The Court may not make credibility determinations or weigh the evidence, but instead "must draw all reasonable inferences in favor of" Plaintiff, "even though contrary inferences might reasonably be drawn." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (internal quotation marks, citation, and emphases omitted). Because "a jury is free to believe part and disbelieve part of any witness's testimony," the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (internal quotation marks, citations, and emphases omitted). Defendants' motion may not be granted unless "resolving all ambiguities and drawing all permissible factual inferences in favor of [Plaintiff] the record taken as a whole could not lead a rational trier of fact to find for [Plaintiff]." *Bellamy v. City of New York*, 914 F.3d 727, 744 (2d Cir. 2019) (citation omitted).

## FACTS

### I.   **Richard Rosario is innocent of the murder of the murder of George Collazo.**

In June 1996, after Jorge "George" Collazo assaulted a woman, Lymari Leon, he was warned that her friends would get revenge and to watch his back. P1.[2] Collazo reasonably feared for his life—as Defendants admit, people in the Bronx have been killed over much less—and obtained and began carrying a loaded gun. P1–P2.

At approximately 1:30 p.m. on June 19, an assailant approached Collazo and his friend Michael Sanchez on the street in the Bronx, said "Hey George, this is for you," and shot Collazo

---

[2] References to Plaintiff's 56.1 statements herein are as follows: "P" for Plaintiff's Statement of Additional Material Facts and "D" for Plaintiff's Response to Defendants' Statement of Undisputed Facts, followed by the paragraph number.

in the head; Sanchez was unharmed. P3. The shooting "absolutely" appeared planned. P3. The light-skinned shooter and his black accomplice had first waited on the block for Collazo earlier in the day; when they returned, the two had an argument suggesting the accomplice was supposed to shoot Collazo but wouldn't do it; the shooter then followed Collazo while his accomplice got in a car; after shooting Collazo in the head, the shooter fled to the waiting car which drove away. P3–P4a–e. Nothing suggested the crime was a robbery. P4f.

Richard Rosario is actually innocent of Collazo's murder. P5. He had no connection to Collazo or Lymari Leon and was over 1,000 miles away in Deltona, Florida, at the time of the crime. P5. At least ten witnesses saw Rosario in Florida throughout June 19 and 20, 1996, accounting for his whereabouts before, during, and after 8:00 or 8:30 a.m. (when the shooter was seen lying in wait on the street) and 1:30 or 2:00 p.m. (when Collazo was shot in New York). P6. On June 19, Rosario was staying with a couple about to have their first child, and the expectant mother was upset that Rosario was still in her home when she was about to give birth. The baby was born the next day, June 20. P6. The couple, their family, and their friends—among them a sheriff's deputy, a pastor, and a corrections officer—clearly remember their interactions with Rosario in relation to the birth. P6. Rosario did not return to New York until July 1, 1996. P89.

## II.   After Defendants initially fail to identify a suspect, Defendant Silverman suggests Rosario.

NYPD detectives Gary Whitaker and Richard Martinez led the Collazo shooting investigation, assisted by detective Irwin Silverman and detective Charles Cruger. P7. Whitaker received any important information in the case, and Whitaker and Martinez discussed all important developments. P7. They learned almost immediately that Collazo had been murdered in retaliation for the Leon assault, and that Collazo had been warned "to watch his ass, cause this girl has some n*****s coming for him." P8.

4

At the scene, detectives identified four people they thought might be eyewitnesses and brought them back to the precinct: Sanchez, passerby Vivene Martinez, Collazo's classmate Nicole Torres, and porter Robert Davis. P9. In the first few hours of a criminal investigation, time is of the essence. P16. In the hours after the murder, Whitaker and Martinez had witnesses view hundreds of photos in mugshot books, but no one identified a suspect. P10.

The jury can conclude that, after the witnesses struck out with the mugbooks, Silverman suggested Whitaker and Martinez look at Richard Rosario. Silverman, a 36-year detective, would notice connections other officers wouldn't and commonly interject his ideas: "I just didn't mind my business." P15. Three months earlier, Silverman had taken a trip to Florida and interviewed Rosario, who was under investigation for a February 1996 robbery-shooting (although the NYPD suspected him, Rosario was not involved in any way in that crime). P13–P14. Given how rare it was to travel for an investigation, this trip (and Rosario) would likely have stood out in Silverman's mind. P13. Shortly after the murder, Silverman interviewed Vivene Martinez, a good eyewitness who provided the most detailed description of the shooters. P11. Her description of the Collazo assailants—a 5'8" Hispanic male, age 18–19, accompanied by a black male—matched the description of the shooters in the February robbery, which had happened less than two miles from the Collazo shooting, suggesting the cases might be connected. P12, P14.

Although Silverman claims not to remember if he made a connection between Rosario and the Collazo shooting on June 19, he admits if he had, he would have shared that with the lead detectives. P16. And there is evidence he did make that connection. On June 19, Silverman sent out an alarm transmittal for the Collazo shooting mentioning Richard Rosario by name. P17. Silverman clearly had made the connection by the next day, when he phoned the deputy in Florida he had worked with on his trip to ask about Rosario. P18.

### III.   Defendants Whitaker, Martinez, and Silverman use suggestion to get Robert Davis to identify Rosario.

At approximately 5:50 p.m., Detectives Martinez, Whitaker, and Silverman went to porter Robert Davis's work. P20. They brought a mugshot book that included Rosario's photo, but Davis failed to identify Rosario from the book. P21. They then showed Davis two or three separate photos, which were either (1) different photos of only Rosario or (2) a photo or photos of Rosario and an unidentified black man (those are the only loose photos in the file) and asked Davis to pick the shooter. P22–P23. Davis pointed out the guy who detectives indicated was "supposed" to have committed the shooting and they told him "Yeah, that's the guy." P24; D69.

As Defendants admit, the identification procedure Davis describes is absolutely suggestive, serious misconduct, and a constitutional violation. P25–P26. It would taint any subsequent identification by Davis. P26. But the jury that convicted Rosario based on Davis's identification never knew how it was actually obtained—because Defendants hid that information from the prosecutor. P102–P104. Instead, Martinez and Whitaker falsely reported that Davis had selected Rosario's photo out of the robbery mugbook. P28–P30. They understood a selection out of hundreds of photos in a mugbook appears exceptionally reliable. P72.

### IV.   Defendants Cruger, Martinez, and Whitaker use suggestion to get Michael Sanchez to identify Rosario.

Michael Sanchez, the friend with Collazo when he was shot and the only other person to identify Rosario at trial, did not make his photo identification until sometime after 8:30 or 9:00 p.m.—well after Defendants had used impermissible suggestion to obtain Davis's identification of Rosario. P61–P64. By then, Sanchez had viewed several mugbooks without identifying anyone, including the same mugbook Davis had seen that included Rosario's photo. P67.

It is not only contrary to NYPD policy to show mugbooks once a suspect has been identified, it's the last thing a detective would want to do because of the likelihood the witness

would pick the wrong person. P48, P72. Defendants claimed Sanchez identified Rosario out of mugbooks—the same false claim they had made about Davis. P66–P67. But Sanchez says he identified Rosario from loose photos, which might have been Polaroids. P69. The only loose photos in the file are three photos of Rosario and one of a black man; three of these are Polaroids. P69. After Sanchez selected Rosario's photo, the detective present told him he "wasn't surprised," giving Sanchez the impression Rosario "was known to the precinct." P70.

Defendants went so far as to photocopy the page in the mugbook from which they falsely claimed Sanchez and Davis had made their identifications. P71. They also falsely claimed that Sanchez identified Rosario first, and Davis second—perhaps to conceal their misconduct during the identification procedures. P64. And Defendants falsely bolstered the reliability of Sanchez's identification by attributing to him details he never provided, while burying discrepancies between his description (that the shooter wore a hat) and others'. P83–P87.

## V. Defendants Martinez and Whitaker fabricate an identification with Jose Diaz.

Over 24 hours after the crime, Martinez and Whitaker interviewed Jose Diaz, a food vendor who had interacted with the shooter. P46. Although there had been plenty of time to create a photo array—which was both what policy required and what any experienced detective would do—Martinez and Whitaker claim they showed Diaz the same robbery mugbook from which they falsely reported Davis and Sanchez identified Rosario. P47–P49, P72. Martinez and Whitaker then claimed that Diaz was the third witness to identify Rosario out of hundreds of photos in the mugbook. P49. But the jury could conclude this, too, was false.

Rosario had no particular distinguishing characteristics that would cause him to stand out from the hundreds of other young Hispanic men in those mugbooks. P73. It would be extraordinarily unlikely for three separate witnesses to independently identify Rosario from among hundreds of photos in mugbooks even if he were guilty. P73–P74. Given that Rosario is

innocent—and the witnesses did not see him—Defendants' account of how they obtained the only evidence against Rosario is a near impossibility. P5, P74.

Although the other witnesses alleged to have identified Rosario (Davis and Sanchez) were subsequently shown a live line up, Diaz was not. P50. At trial, the prosecutor asked Diaz to identify Rosario in the courtroom—an extraordinarily suggestive identification procedure—but Diaz could not. P52. If Diaz had actually selected Rosario's photo from the mugbook as Defendants claim, he would have been likely to identify Rosario again from any subsequent identification procedure; his failure to do so suggests what Defendants claim is false. P51.[3]

## VI.    Defendants Whitaker and Martinez bury exculpatory information from Nicole Torres.

Nicole Torres, a friend of Collazo and Sanchez, witnessed the shooting from five to ten feet away and described to detectives including Whitaker how it had appeared to be a planned hit, with the shooter saying "Hey George, this is for you" right before he shot Collazo. P31–P32. Torres was one of four witnesses brought to the precinct and asked to identify the shooter from a mugbook shortly after the murder; like the others, she did not select anyone. P33. Days later, Whitaker and Martinez came to Torres's work, showed her a single photo, and asked if that was the shooter. P34. The only reasonable inference is the photo was of Rosario: it was of a "common Hispanic person" whom Torres did not recognize,[4] the only loose photos in the file of a Hispanic man are of Rosario, Rosario was the sole suspect, and the detectives mentioned something about the person having a connection to Florida. P23, P34–P36. Although Torres would have been happy to identify the shooter if she could, she made it "absolutely" clear that she did not recognize the person in the photo. P36.

---

[3] Diaz died before this action commenced and never testified concerning his interactions with police. P46 n.2.

[4] Torres and Rosario do not know each other. P112.

The single-photo showing Torres describes is strictly prohibited by NYPD policy because it is unduly suggestive. P35. Even so, Torres did not identify Rosario. P36. All witness statements and all identification procedures had to be documented and provided to the prosecutor, including any evidence tending to show the suspect might be innocent. P38, P40. Torres's information that the shooter knew and targeted the victim exculpated Rosario, who had no prior connection to Collazo or Lymari Leon, and Torres's non-identification of Rosario from a suggestive identification procedure was also exculpatory. P39–P40, P53. But none of this exculpatory information was reported or known to the jury; at trial, the prosecution theory was the murder arose out of a brief argument on the street. P39, P41, P111. The prosecutor did not know Torres witnessed the shooting or that she could describe it as a planned hit; the only police reports regarding Torres falsely represent that Torres only came to the scene after Collazo was shot. P39, P42. There is no documentation of either identification procedure with Torres in the file—not the mugbooks and not the single photo showing. P41.

## VII.    Defendants bury other exculpatory information.

Defendants understood Collazo's murder was likely in retaliation for his assault on Lymari Leon and that they had no evidence connecting Rosario and Leon. P53. Although Leon was interviewed by detectives three or four times, only one interview with Whitaker and Martinez is documented; there is no documentation of any identification procedures. P54, P60. But in fact, Whitaker and another detective brought Leon to the precinct, showed her a page from a mugbook, and asked if she knew anyone. P55. After she repeatedly said no, a detective pointed to a specific photo of a "tan person, not too dark, but not too light" and asked two or three times if she knew him. P56. The jury could conclude this photo was of Rosario—Whitaker admits he wanted to investigate any connection between Leon and Rosario, and his notes include a question for Leon on whether she knew Rosario but her answer (she doesn't) was not reported.

P53, P58. The identification procedure Leon describes is prohibited because it is impermissibly suggestive. P57. Whitaker claims Leon is lying, but both he and Martinez admit Leon describes precisely the same misconduct as Nicole Torres and Robert Davis. P59.

Vivene Martinez, a good eyewitness, was one of the four brought to the precinct shortly after the murder; she saw the perpetrators for a substantial period and provided the most detailed descriptions of them. P11–P12, P43.[5] It was her description of the perpetrators' clothing and car that was used on the alarm transmittal the day of the crime; this description was also falsely attributed to Michael Sanchez to bolster his opportunity to view the perpetrator. P17, P43, P84–P86. The jury can conclude she was shown photos: Detective Martinez would "fully expect" that Vivene Martinez would have been shown photos or a lineup, and the only legitimate reason not to do so would be if the police could not find her. P44. But that is not the case, as she was in the precinct at the same time three other eyewitnesses viewed mugbooks there. P44. Although all three of those witnesses (Davis, Sanchez, and Torres) viewed mugbooks and were subsequently shown loose photos in suggestive identification procedures, there is no record of *any* identification procedure with Vivene Martinez at any time. P20–P22, P33–P34, P45, P61, P69. Defendants knew where Vivene Martinez lived and had her number—the jury can conclude that, as they did with Torres, Defendants returned to her later, showed her a single photo, and attempted to obtain an identification of Rosario, but failed.

## VIII.    Defendants in bad faith fail to investigate Rosario's alibi.

While still in Florida, Rosario learned from family he was wanted for murder and returned by bus to New York to clear his name. P89. On July 1, 1996, Silverman interviewed Rosario after he turned himself in; Rosario explained he could not have committed the murder

---

[5] Despite counsel's best efforts, Plaintiff was unable to locate and depose Martinez. P43 n.1.

because he was in Florida, and provided detailed information about his alibi, including names and addresses. P89–P90. Silverman understood the alibi could prove guilt or innocence and had to be followed up; he provided a detailed report and also told someone specifically to follow up on it (although he could not remember if it was Whitaker or Martinez). P91.

Martinez admits there is no legitimate police reason not to investigate an alibi, which should be done immediately to prevent the police from holding someone they shouldn't. P93. Investigating requires talking to alibi witnesses and trying to corroborate what they say through, e.g., E-Z pass or Greyhound records. P94. An alibi grounded in a child's birth—like Rosario's— is very specific, because the birthdate can be verified. P94. If the alibi was verified, Rosario could not have committed the crime and there would be no probable cause to arrest him. P92.

No one ever investigated Rosario's alibi. P95. At his deposition, Martinez claimed that he never learned about the alibi until 2016, years after Rosario's wrongful conviction, but that he would have investigated it had he known about it. P95–P96. Martinez, however, was present with Whitaker when Rosario gave a detailed alibi at his interrogation and, as second detective, knew about any important development in the case. P7; D111. Whitaker, by contrast, admitted that he would have known of the alibi at the time, but claimed he made a decision not to investigate it in consultation with other detectives and the supervisor, and denied he had any obligation whatsoever to investigate an alibi. P97–P98.

Rather than investigate the alibi, on July 2, Whitaker and Martinez interrogated Rosario in an unsuccessful attempt to get a confession. P99; D111. Rosario told detectives he was innocent and repeated he had been in Florida at the time of the crime. P99. This interrogation should have been documented in a report, but it was not. P99–P100. Whitaker admits there is no legitimate police reason he did not create a police report of this interrogation. P99.

11

**IX.    Rosario is wrongly convicted based on Davis and Sanchez's false identifications.**

Defendants forwarded their police reports—including those falsely claiming Sanchez, Davis, and Diaz all identified Rosario from the same mugbook—to the prosecutor, Jeanne Petrauskas. P101. Defendants all understood that if three witnesses had independently selected Rosario from among hundreds of photos in mugbooks it suggested the identifications were particularly reliable. P72, P74, P104–P105. Petrauskas had not been present for any of the initial identification procedures and relied on Defendants' representations. P102. She was not aware of any suggestion used to obtain any of the identifications. P103–P106, P108–P109. Defendants repeated their misrepresentations during the pretrial hearing on the admissibility of the witness identifications, where they also entered the photocopied page from the mugshot book as an exhibit. P110. Petrauskas did not know that Torres was a witness to the shooting, let alone any of the exculpatory information Torres had provided to the police. P107.

At trial, no physical or forensic evidence tied Rosario to the crime; there was no connection between Rosario and the victim and no obvious motive. P5, P111. The prosecution relied on the identifications by Sanchez and Davis and described the shooting as arising out of a brief argument on the street minutes before the shooting. P111, P114. The prosecution attempted to elicit an in-court identification from Diaz, but he failed to identify Rosario. P115. Based on Defendants' report that Diaz had earlier picked Rosario from a mugbook, the prosecutor asked Diaz if "back in June of 1996" he had recognized anyone and then tried to direct his attention to Rosario before an objection was sustained. P115.

Rosario testified that he was innocent and had been in Florida at the time of the crime, but only two of the alibi witnesses made the trip up from Florida to testify for him. P113. The jury did not learn of the suggestion used to elicit the identifications of Sanchez and Davis, or of Defendants' other misconduct in the investigation. P101–P110. The jury did not learn that the

12

shooter said "Hey George, this is for you," immediately before shooting Collazo in a planned hit, or that Nicole Torres had failed to identify Rosario in a suggestive procedure. P112.

The prosecution emphasized that it would be an unlikely "coincidence" if both Davis and Sanchez had independently picked the same person, and argued this proved Rosario's guilt. P117. The jury requested a readback of Sanchez's testimony—specifically, whether he picked Rosario out of a lineup or a book—but ultimately convicted Rosario. P118.

## X.      Twenty years later, Rosario is exonerated.

Rosario consistently maintained his innocence and fought to overturn his conviction. P120. Eventually, a Bronx County District Attorney's Office reinvestigation concluded his trial was unfair because his lawyer had not presented substantial evidence corroborating his alibi and consented to vacate his conviction. P121. The BCDAO concluded it could not prove Rosario's guilt—if he were retried, an acquittal was likely—and moved to dismiss the indictment. P117. Rosario spent almost 20 years wrongly incarcerated. P5, 121.

## ARGUMENT

## I.      Defendants systematically deprived Plaintiff of a fair trial.

Unsurprisingly, given his innocence, the case against Rosario was never strong. No physical or forensic evidence implicated him. Rosario had no prior connection to the victim or any of the witnesses, in a case in which the victim was clearly targeted and no property was demanded or taken. Rosario consistently denied any participation in the crime and had detailed evidence that he was over 1,000 miles away at the time. As the prosecution acknowledged, the jury could only convict if it believed Davis and Sanchez's identifications were reliable and rejected Rosario's alibi. But the weakness of stranger eyewitness identification testimony has long been recognized: "Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evidence." *Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir.

13

1978). And Diaz, a third eyewitness, did not recognize Rosario in the courtroom.

Rosario should never have been convicted. And absent Defendants' pervasive misconduct throughout the investigation—suppressing exculpatory evidence, fabricating evidence, and using impermissible suggestion to obtain identifications—he would not have been.

### A. Defendants suppressed exculpatory evidence.

It is undisputed that "[w]hen police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating…*Brady*." *Bellamy*, 914 F.3d at 751; *see also Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc). Plaintiff must show he was prejudiced by the suppression because there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"—for example, "he would have been acquitted based on reasonable doubt or convicted on a lesser charge." *Bellamy*, 914 F.3d at 751 (internal quotation marks omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Here, Defendants suppressed critical evidence, including: evidence severely undermining the reliability of the only two identifications offered against Rosario at trial (Robert Davis and Michael Sanchez);, evidence from another witness—Nicole Torres—that the killer was not Rosario, but rather someone who had a history with the victim; and additional evidence of Defendants' misconduct throughout the investigation which impeached the detectives and undermined the reliability of the investigation as a whole.

### 1. Defendants Martinez, Whitaker, and Silverman deliberately suppressed evidence that Robert Davis's identification was unreliable.

As this Court has already held, and Defendants do not dispute at this stage, evidence that

Defendants conducted and covered up suggestive identification procedures with Davis, one of the only two witnesses who identified Rosario at trial, is *Brady* material. The Court found that "[b]y failing to report and inaccurately describing these circumstances in their reports, and by testifying that they did not employ suggestive techniques, [Defendants] withheld material information that could have impeached the critical eyewitness at trial." D.E. 146 at 12.

Davis's testimony echoed the allegations in Rosario's complaint. Davis testified, as Rosario had pleaded, that officers came to his work, spread out two to three photographs; pointed out the guy who was "supposed" to have done the shooting; and, when he identified Rosario, told him he picked the right guy. P22–P24. It is undisputed this information was suppressed from the prosecutor, defense, and jury, who were instead informed Davis had selected Rosario's photo in an unsuggestive procedure out of two or three *books* worth of photos. As the Court has already found, these facts alone are enough to make out a *Brady* claim; because the undisclosed information would have impeached Davis's identification at trial, the suppression calls the verdict's reliability into question. *See* D.E. 146 at 12, *see also Bermudez v. City of New York*, 790 F.3d 368, 376 & n.4 (2d Cir. 2015) (holding suppression of evidence of suggestion in identification procedures supports § 1983 *Brady* claim).

But the record demonstrates Defendants' misconduct is even worse than was known at the time of pleading. First, Defendants initially showed Davis a mugbook including Rosario's photo, *and he failed to pick Rosario out*. Second, the jury could conclude that the two to three photos shown to Davis were either *all* photos of Rosario or were photos of Rosario and an unidentified black man (when the shooter was light-skinned). As Defendants admit, there is no legitimate reason for there to be individual photos in the police file. The only four loose photos in the file are three different photos of Rosario and one photo of an unidentified black man.

Although Davis described the few photos he was shown as being of different people, the different photos of Rosario—taken at different ages—look like they could be different people.

In other words, Davis was told to "pick the shooter" out of two to three photos where either (1) all his choices were Rosario or (2) the only choices that were the same race as the shooter were Rosario. That is the equivalent of a single photo identification, which it is undisputed is highly suggestive, improper, and unreliable. *See, e.g., Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013) (describing single-suspect identification procedures as unreliable and "widely condemned"); *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017) (describing as "paradigmatic example of an improperly suggestive" procedure where suspect was only one wearing a red shirt like that worn by the assailant). Furthermore, that suggestion would taint any future identifications made by Davis, rendering his testimony inaccurate and unreliable. But the jury that convicted Rosario never knew of any suggestion with Davis at all.

Defendants argue that there is no evidence of Silverman's personal involvement in any misconduct. D.E. 169 at 5–6. Actually, the evidence establishes he was directly involved in the suggestive identification procedure with Davis. Davis testified he retained business cards from all officers who interviewed him at work—where he was shown two to three photographs—and produced cards from Silverman, Whitaker, and Martinez. P20–P24. When asked to explain why Davis had his card, Silverman speculated that he must have gotten it from the street or a garbage can. D31. But the jury can conclude from Davis's testimony that *all three* Defendants were present for the suggestive photo showing. This is particularly plausible given that Defendants conducted a suggestive photo procedure aimed at obtaining an identification of Rosario, and Silverman is the one with a prior connection to Rosario.

### 2. Defendants Whitaker and Martinez deliberately suppressed exculpatory statements from and identification procedures with eyewitness Nicole Torres.

The Court previously held that Plaintiff adequately pleaded a *Brady* claim regarding

statements taken from Nicole Torres, describing its reasoning as follows:

> Regarding Ms. Torres, the Complaint alleges that she told police she heard the shooter address the victim by name and denied Plaintiff was the shooter upon seeing his photograph. The police allegedly did not timely notify the defense of these statements….The Complaint further pleads that suppression of Ms. Torres' statements, which directly contradicted eyewitness identifications, undermines confidence in the verdict, which depended solely on these eyewitnesses.Her statements not only provide direct evidence that Plaintiff was not the shooter, but they also reinforce this position because Plaintiff did not know the victim by name.

D.E. 146 at 11. Again, discovery has more than borne out Rosario's allegations.

Torres testified that she saw the shooter: approach her friends Collazo and Sanchez; shout

"Hey George, this is for you!"; shoot Collazo in the head; and flee in a waiting car. Based on her

observations, Torres believed the shooting was "absolutely" a planned hit. Police brought her

back to the precinct because she was an eyewitness to the crime; they were only bringing back

witnesses who could make identifications. At the precinct, Torres described everything she saw

to detectives, including Whitaker, and was unable to identify the shooter from a huge book filled

with tons of pictures. P32. A few days later, Whitaker and Martinez showed her a single photo of

a "common Hispanic person" and asked her if she thought the person was Collazo's shooter,

telling her the person had some kind of connection to Florida. P36. Torres made clear to the

officers that she did not recognize the person; if she had she would have been more than happy to

volunteer that information. P36. The jury can conclude that the person was Rosario: he was

Defendants' sole suspect by the time, he is the only Hispanic person for whom there are single

photos in the file, and police knew he "had some kind of connection" to Florida as Silverman had interviewed him there months before.

As the Court already found, Torres's failure to identify Rosario as the shooter and description of the shooting as a planned hit by someone who knew the victim rebut the *only* evidence against Rosario. This more than undermines confidence in the verdict—it "would have had seismic impact" at trial. *Leka v. Portuondo*, 257 F.3d 89, 106–107 (2d Cir. 2001); *see also Smith v. Cain*, 565 U.S. 73, 76 (2012); *Boyette v. Lefevre*, 246 F.3d 76, 92 (2d Cir. 2001).

It is undisputed that the events Torres describes were not documented in any police report. Defendants dispute only whether there is any evidence that any Defendant ever learned this information from Torres. But Torres testified that she told the police everything she witnessed during the shooting, had no reason to hold anything back, and would have helped in any way she could. Because Whitaker and Martinez both *acknowledge* interviewing Torres—Whitaker's name appears on both DD5s documenting Torres interviews and Martinez's appears on the second—the jury can conclude that Torres told Whitaker and Martinez the words she heard the shooter use and they failed to document it and disclose it. On an almost identical record, where a witness testified she had reported information to the police which the investigating detectives both denied, the Second Circuit held that "create[d] a triable question of fact as to whether the statements were made to either of the detectives (and not disclosed to the prosecution)." *Bellamy*, 914 F.3d at 752. Furthermore, even if she had told other officers, any information developed during the investigation would have been reported to the leads: Whitaker and Martinez. P7.

Nor was it enough, as Defendants suggest, simply to disclose Torres's *name*. The exception to the *Brady* rule for facts a defendant "knew or should have known" speaks only "to

facts already within the defendant's purview, not those that might be unearthed. It imposes no

duty upon a defendant, who was reasonably unaware of exculpatory information, to take

affirmative steps to seek out and uncover such information." *Lewis v. Comm'r of Corr.*, 790 F.3d

109, 121 (2d Cir. 2015). Defendants not only suppressed Torres's statements regarding the crime

scene, they affirmatively misrepresented that she did not see the shooting. Rosario was therefore

"reasonably unaware" of Torres's importance as a witness—just as the prosecutor was.[6]

### 3. Defendants Whitaker, Martinez, and Cruger deliberately suppressed evidence that Michael Sanchez's identification was unreliable.

Plaintiff also developed abundant evidence of misconduct procuring Sanchez's

identification—the second of the two identifications offered against Rosario at trial. Defendants

claim that Sanchez was the first witness to identify Rosario, and that he selected him from

among hundreds of photos in mugbook without any suggestion. Evidence, however, suggests this

is all false. First, Sanchez made his identification well after Davis. Police reports place Davis's

identification at 5:50 p.m.; by Sanchez's description, his identification would have happened

after 8:30 or 9:00 p.m., when it got dark out in June. In addition, Defendants Martinez and

Cruger claimed in reports and testimony that Sanchez looked at a robbery mugshot book with

Rosario's photograph. Sanchez acknowledged looking through mugshot books first but denied

identifying Rosario from a book; he said he made his identification from loose photos. That

would mean just like Davis, Sanchez saw Rosario in the mugbook and failed to identify him

before later identifying him from loose photos. *See Kampshoff v. Smith*, 698 F.2d 581, 583 n.1

---

[6] In a bit of revisionist history, Defendants suggest Rosario was not harmed by the suppression of Torres's statement because what Davis reported hearing—"You're not going to do this no more"—could also "suggest a prior knowledge or relationship." D.E. 169 at 32 n.15. But as the prosecutor argued at trial, Davis's statement is perfectly consistent with the prosecution theory that the shooting arose out of fight on the street moments before. "Hey George, this is for you," by contrast, suggests a relationship before that interaction.

(2d Cir. 1983) (noting, as sign witnesses' identifications were unreliable, that within days of the crime they viewed "mug[shot]s, including [defendant's, and t]hey went right by his mug").

While Sanchez claims he saw "stacks" of loose photos, there are reasons to disbelieve this portion of his testimony. *See In re Dana Corp.*, 574 F.3d at 152 (noting "a jury is free to believe part and disbelieve part of any witness's testimony"). Notably, no police witness describes showing Sanchez stacks of photos or even claims they would have been available; what they had in the robbery room were mugbooks. There were, however, four loose photographs in the file, three of which were of Rosario, and other witnesses have described police showing somewhere between one (Torres) and two to three (Davis) loose photographs.

Most significantly, what Defendants claim happened with Sanchez's identification (and Davis's and Diaz's) cannot be true. There is nothing distinctive about Rosario's appearance that would make him stand out among the hundreds of other young Hispanic men. As eyewitness expert Dysart explains, it would be extremely unlikely for three separate people to select Rosario's photo from among hundreds in mugbooks *even if he were actually guilty and they had seen him commit the crime*. But he's innocent; the witnesses didn't see him, making what Defendants describe a near impossibility. Whitaker admits that, if Rosario is innocent, it is "inconceivable" three separate people would select him from mugbooks. P74. The jury may "consider [Defendants'] dishonesty about [this] material fact as 'affirmative evidence of guilt.'" *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (internal citation omitted).

A reasonable jury could conclude from all this evidence that it is not plausible that when police already suspected Rosario (based on Silverman making the connection), and Davis had already selected Rosario from a highly suggestive procedure essentially directing him to select

Rosario's photo, that Sanchez would coincidentally happen to pick the same innocent person from a non-suggestive procedure including stacks and stacks of photographs.

Finally, there are many indications Sanchez was not wholly truthful or reliable. He denied the shooter called out George by name, falsely claiming it was a random shooting arising out of a street fight; he lied about his actions after the shooting, falsely claiming he chased the shooter and could confirm he did not escape in a car; he testified he dated Lymari Leon (the person whose assault led to the retaliatory threats against Collazo) for months; he lied about his role in procuring the gun Collazo was carrying; and Collazo's family believes he either had some involvement himself in the shooting or knows more than he is letting on; indeed, he told Davis he knew who the shooter was. P75–P82. Whether due to fear of or a connection to the real perpetrators, Sanchez's testimony is not credible. The jury could disbelieve Sanchez's testimony about the number of photos he viewed and believe that his identification, too, was the result of the type of suggestion Davis, Torres, and Leon all described.

It is undisputed none of this evidence of misconduct in Sanchez's identification was disclosed to the prosecution or defense. This suppressed evidence, too, undermines confidence in the result of Rosario's trial. Indeed, the Second Circuit has found far less significant suppressed evidence sufficient to support a § 1983 *Brady* claim. *See, e.g.*, *Bellamy*, 914 F.3d at 751–54 (holding both (1) prior inconsistent statement from one of two witnesses to identify defendant at trial as to which date she saw defendant and (2) her misidentification of alleged second suspect seen with defendant were each independently *Brady* material).

Defendants assert that Cruger had no personal involvement in any constitutional violation, arguing that his perjury at Rosario's pretrial hearing alone is insufficient to hold him liable. D.E. 169 at 6–7. But it is undisputed that Cruger conducted the identification procedure

with Sanchez, and his report omitted any mention of suggestion—a clear violation

of *Brady*. *Bermudez*, 790 F.3d at 376 & n. 4. Cruger failed to document any of the details

required by NYPD policy—including the books he showed to Sanchez, how many books he

showed, or even when the identification was made. D37. Yet, in representations to the prosecutor

and when he testified at Rosario's pretrial hearing, he lied and claimed to remember which books

he showed Sanchez, what time the ID was made, and even what Sanchez said later. D37. The

jury can conclude that these deviations are evidence Cruger was covering up the true, suggestive

circumstances of the identification. *See, e.g.*, *Restivo v. Hesseman*, 846 F.3d 547, 580 (2d Cir.

2017).

### 4.  Defendants including Silverman deliberately suppressed an identification procedure with eyewitness Vivene Martinez.

Evidence also suggests Defendants suppressed an exculpatory identification procedure

with Vivene Martinez. Vivene Martinez was indisputably a good eyewitness. Indeed, evidence

suggests she was the best of all the witnesses identified—she had an opportunity to observe for a

substantial time before the shooting and provided the most detailed description of the

perpetrators. Vivene Martinez's description of the perpetrators was used for the alarm transmittal

and later falsely attributed to Sanchez. Defendant Martinez admits he would "fully expect" that

Vivene Martinez would have been shown photos or a lineup, and the only legitimate reason not

to do so would have been if she couldn't be located. But Silverman interviewed her at the

precinct at the exact same time three other witnesses—Davis, Torres, and Sanchez—were

viewing mugbooks, and Defendants had her phone number and address, so there is no reason she

would not have been shown photos, too.

Although any showing of mugbooks should have been recorded in a DD5, Defendants

failed to record two separate exculpatory photo procedures with Nicole Torres (her viewing of

mugbooks at the precinct and the later single-photo showing in which she did not recognize Rosario). And while Defendants have an incentive to conceal exculpatory evidence—to protect their case against Rosario and hide their misconduct—there would be no reason for them to fail to record evidence that was neutral or inculpatory. The jury can conclude from all this evidence that Vivene Martinez was shown photos, that the information she provided was helpful to Rosario, and that Defendants suppressed it—just as they did with so many other witnesses.

### 5. Defendants' suppression of exculpatory evidence prejudiced Plaintiff.

Given the weakness of the case against Rosario, each piece of suppressed information individually would have been sufficient to undermine confidence in the outcome. Where, as here, eyewitness identification "was the *only* evidence" linking the suspect to the crime, undisclosed evidence impeaching those witnesses is "plainly material." *Smith*, 565 U.S. at 76; *see also Mellen v. Winn*, 900 F.3d 1085, 1097 (9th Cir. 2018) (reversing summary judgment on § 1983 *Brady* claim and recognizing that "impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case" (alteration and internal quotation marks omitted)). And eyewitness impeachment is even more important in a case like Rosario's, where the stranger witnesses were pitted against a well-corroborated alibi. *See Boyette*, 246 F.3d at 92 (reversing a denial of habeas corpus because withheld impeachment of eyewitness "seriously undermine[d] confidence in the outcome of the trial" when there was no physical evidence and defendant had a corroborated alibi (internal quotation marks omitted)).

But materiality must be "considered collectively, not item by item," *Kyles*, 514 U.S. at 436; *Boyette*, 246 F.3d at 92, and the collective impact of all suppressed information would have devastated the prosecution's case. Indeed, the jury can conclude Defendants suppressed even more evidence of their own misconduct throughout the investigation, including the suggestive identification procedure with Lymari Leon and their own fabrication of multiple reports

23

described in more detail below. *See, e.g.*, *Bermudez*, 790 F.3d at 376 n.4 (holding the same facts proving a fabrication claim can also prove a *Brady* claim). Particularly given that the conviction in this case hinged on identifications Defendants procured—and therefore the reliability of the procedures Defendants used to obtain them—this evidence, too, was material. *See Kyles*, 514 U.S. at 445–49 (finding *Brady* violation based on suppression of evidence that undermines the credibility and reliability of the investigating officers and the investigation as a whole).

### 6. Defendants' suppression of exculpatory evidence was deliberate.

Defendants' primary argument against Plaintiff's *Brady* claims concerns their state of mind—a quintessential fact question that can rarely be decided on summary judgment. *See, e.g.*, *Gelb v. Bd. of Elections*, 224 F.3d 149, 157 (2d Cir. 2000) (holding "summary judgment is generally inappropriate where questions of intent and state of mind are implicated"). That is a nonstarter. Defendants do not claim, for example, that they carelessly forgot to report that the sole evidence they had amassed against Rosario was the result of blatantly improper suggestion. Rather, at their depositions, Defendants claimed the witnesses who describe suggestive identification procedures are all lying. But while they can make that argument at trial, they may not do so at this stage. If Plaintiff's evidence is credited—which it must be on this motion, *see Binder & Binder PC*, 481 F.3d at 148—Defendants' suppression was deliberate.[7]

In addition, evidence of a defendant's persistent deviations from "applicable professional standards" can "support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Restivo*, 846 F.3d at 580 (internal quotation marks omitted); *see also*

---

[7] The Second Circuit has never decided what degree of culpability must be shown for a § 1983 *Brady* claim. *See, e.g.*, *Bellamy v. City of New York*, 914 F.3d 727, 751 n.23 (2d Cir. 2019) ("We have suggested, though without so concluding, that a civil *Brady* claim requires a showing that the non-disclosure was intentional."). The Court need not stake a position on this matter, however, because the evidence supports an inference of intentional misconduct.

*Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) (same); *Dufort*, 874 F.3d at

349 (holding "Defendants' unusual decision to depart from normal [police] practice" must be

construed against them on summary judgment). Here, Defendants have admitted pervasive

deviations from required police procedure, for which they can offer no good faith explanation.

This includes their extensive failures to document (e.g., multiple witness interviews,

identification procedures, any pertinent details about Sanchez's identification procedure, and

Martinez and Whitaker's interrogation of Rosario) and investigate Rosario's detailed alibi. That,

too, amply supports a finding of deliberate misconduct.

### B. Defendants fabricated false reports concerning the eyewitness identifications.

There is no dispute that "a police officer's fabrication and forwarding to prosecutors of

known false evidence works an unacceptable corruption of the truth-seeking function of the trial

process." *Ricciuti v. N.Y.C. Transit. Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (internal quotation

marks omitted). To prove his fabrication claim, Plaintiff must show that "an (1) investigating

official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that

information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property

as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). Fabricated

evidence "may be 'false' if material omissions render an otherwise true statement false." *Morse*

*v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015).

The jury can find that Defendants sent to the prosecution fabricated evidence including:

- A DD5 falsely claiming Davis made his initial identification from hundreds of photos in a robbery mugbook, when it was actually from two to three photos of either only Rosario or Rosario and a black man.
- A photo of a page in the mugbook that they falsely claimed was the page from which Davis, Sanchez and Diaz all made their identifications of Rosario, when actually no witness identified him from the mugbook.
- False reports that Sanchez identified Rosario first, when it was actually hours after Davis did from an impermissibly suggestive procedure.

- False report that Sanchez identified Rosario from the same robbery mugbook as Davis, when he actually made his identification from loose photos.
- A DD5 claiming that Sanchez gave a detailed description of the shooter, including his hairstyle. In fact, Sanchez initially described the shooter as wearing a hat and admits that the description in the DD5 must have come from somebody else.
- A DD5 falsely claiming that Torres did not witness the shooting and omitting the "Hey George, this is for you" statement and an exculpatory identification procedure.[8]

The jury can also find that Defendants fabricated the identification they reported from food vendor Jose Diaz. Defendants claimed Diaz was the third witness to independently select Rosario from among hundreds in a mugbook. But it is unlikely they would have even shown Diaz the mugbook a full day after Rosario had been identified, and a "near impossibility" that Diaz would coincidentally select the same innocent man. Diaz was never asked to see a live lineup and then failed to identify Rosario in court, despite the inherent suggestiveness of in-court identifications and the likelihood a witness will select the same person he has already identified, even if the initial identification was incorrect. The jury could conclude from all this that Diaz never identified Rosario at all, and certainly not in the manner Defendants represented.

Defendants' only response is a cursory assertion that no fabricated evidence could have caused Rosario's wrongful conviction. Defendants fabricated essentially the entire basis for the prosecution, and all incriminating evidence offered against Rosario at trial. Defendants' misrepresentations were the basis for the trial court's denial of the motion to suppress the identifications—the fabricated copy of the mugshot book page was entered as an exhibit at the pretrial hearing. And Defendants relied on their reports at trial, including when Martinez referred to his DD5 with the fabricated description from Sanchez from the stand.

---

[8] As lead detective, Defendant Whitaker had an obligation to review the accuracy of all police reports before forwarding them to the prosecution. Thus, although non-party St. Clair is attributed as the author of the DD-5 claiming Torres did not see the shooting, Whitaker, whose name appears as an interviewer, had the ultimate responsibility of ensuring it was correct.

Furthermore, as the Second Circuit has made clear, fabricated evidence may cause a liberty deprivation in multiple ways. If the prosecutor accepted Defendants' falsified evidence, "[she] might have been led to conclude, incorrectly, that any defects in the witnesses' identifications were minor matters and for that reason could be ignored." *See Bermudez*, 790 F.3d at 375. Indeed, Petrauskas testified that she *did* rely on the police reports, saw no problems with the identifications, and never learned that Torres witnessed the shooting. Accordingly, "there are triable issues of fact concerning whether [the prosecutor's] decision to bring charges was tainted by misleading information." *Id.* at 376. And even though Diaz did not identify Rosario *at trial*, the jury can still conclude that the fabricated DD5 caused Rosario harm. *See Bellamy*, 914 F.3d at 748–49 (reversing summary judgment where fabrication that was the basis for a prosecutor's question caused the jury to have an "incorrect impression" that eyewitness made an identification even where the witness failed to identify the plaintiff at trial and the DD5 was not entered into evidence); *see also Jackson v. City of Cleveland*, 925 F.3d 793, 816 (6th Cir. 2019) (holding fabricated evidence could affect the decision of the jury, and thereby cause a wrongful conviction, even where it was not introduced into evidence, if it was "used to obtain evidence later shown to the jury" or "used as the basis for a criminal charge").

### C.  Defendants obtained the identifications through impermissible suggestion.

The Second Circuit has made clear that officers may be held liable in a § 1983 action for using impermissibly suggestive identification procedures to obtain identifications that are subsequently used to convict a suspect. *See Bermudez*, 790 F.3d at 374–76. Defendants do not dispute that the identification procedures described above—the presentation of two to three photos which were either (1) all different photos of Rosario or (2) photos of Rosario and a black man—would be impermissibly suggestive. Nor could they. *See, e.g.*, *United States v. Fernandez*, 456 F.2d 638, 641–42 (2d Cir. 1972) (holding impermissibly suggestive a photo array in which

27

the accused was the only person with the same skin tone and hairstyle as the perpetrator). Rather

they dispute the facts, claiming there was no suggestion in the identification procedures at all.

Because the jury could find there was, that provides no defense at this stage.[9]

Defendants curiously assert the suggestive identification procedures could not have

harmed Rosario because there was no testimony about the improper means used to obtain the

identifications, just the ultimate identification by the witness. That is exactly backward. As has

been recognized for decades, the danger of an unduly suggestive identification procedure is that

it causes an *irreparable* misidentification—that is, that it so taints any subsequent identification

testimony as to render it fundamentally unreliable. *See Dickerson v. Fogg*, 692 F.2d 238, 244 (2d

Cir. 1982). Thus, when the procedure is suggestive enough, any identification testimony from

that witness cannot be introduced consistent with Due Process. *See, e.g., Raheem v. Kelly*, 257

F.3d 122, 133–34 (2d Cir. 2001); *Dickerson*, 692 F.2d at 247. There is no dispute identification

testimony from Sanchez and Davis was used against Rosario at trial; that was the sole direct

evidence of his guilt. But the suggestive means used to obtain these identifications were kept

from the prosecutor, court, and jury, causing them to wrongly believe the identifications were

reliable. *See Bermudez*, 790 F.3d at 376 (holding Defendants could be proximate cause of due

process deprivation where they failed to inform the prosecutor about problems in the initial

---

[9] Although this Court ruled on the motion to dismiss that Plaintiff did not have evidence of
Silverman's personal participation in the suggestive identification procedures, D.E. 146 at 9, 12,
the evidence of Silverman's personal involvement in the Davis photo showing was unknown to
Plaintiff until uncovered during discovery. Contemporaneous reports falsely suggested
Silverman was not involved, and he himself denied it. This newly discovered evidence justifies
reinstating the suggestive identification portion of these claims against Silverman. *See Doctor's
Assocs., Inc. v. Distajo*, 107 F.3d 126, 131 (2d Cir. 1997) (holding a court may properly
reconsider a prior ruling before final judgment "when new evidence indicates that its prior view
was unsound"); *see also, e.g.*, *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 CIV. 9931
(WHP), 2009 WL 3364036, at *4–9 (S.D.N.Y. Oct. 16, 2009) (re-joining a defendant who had
been dismissed on personal jurisdiction grounds based on newly discovered evidence).

questioning of witnesses which "could have prevented [the prosecutor] from making an informed decision about the reliability of that evidence").[10]

For the same reasons, the lineup cannot cure the constitutional violation. As Defendants' own expert admits, the first identification procedures permanently tainted the witnesses' memory, and any subsequent identifications were *caused* by the first procedure. As in *Bermudez*, the jury can find that Davis and Sanchez's subsequent identifications can be explained by the suggestive identification procedure—"they might very well have decided to stick with that story (or become convinced that it was true), and for that reason…misinformed the ADA when [she] subsequently questioned them." 790 F.3d at 375–76.

Bizarrely, Defendants claim again and again that Rosario did not suffer a deprivation of liberty. It is, however, undisputed that Rosario was *convicted of murder* and sentenced to *25-years-to-life*; he then served nearly 20 years of that sentence. Defendants' assertion that his robbery plea bars his claims is similarly meritless. First, he was only sentenced to 3-to-6 years on the robbery, which is far less than the nearly 20 years he spent wrongly incarcerated. *Cf. Walker v. Sankhi*, 494 Fed. App'x 140, 142–43 (2d Cir. 2012) (finding no liberty deprivation when "throughout the pendency of that charge" plaintiff was in custody on another matter). More importantly, Rosario did not commit that robbery; he was induced to plead guilty because he was promised the time would run concurrently with his wrongful conviction. He is therefore legally entitled to have that conviction vacated, which he intends to do before this trial.[11]

---

[10] Contrary to Defendants' argument, Davis's trial testimony did not "mitigate[]" their misconduct, D.E. 169 at 35 n.22; it exacerbated it. It is undisputed the jury never learned about the suggestion Davis described at his deposition.

[11] *See People v. Pichardo*, 1 N.Y.3d 126, 130 (2003) ("[W]hen a guilty plea is induced by the court's explicit promise that the defendant will receive a lesser sentence to run concurrently with a sentence in another case, and that [other] conviction is overturned, the defendant may withdraw his plea…since the promise cannot be kept.").

**D.  Defendants are not entitled to qualified immunity for their fair trial violations.**

For over 20 years, the Second Circuit has consistently held that qualified immunity is unavailable in cases where law enforcement officers fabricate evidence. *See, e.g.*, *Ricciuti*, 124 F.3d at 130; *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000); *Morse*, 804 F.3d at 546–50; *Garnett*, 838 F.3d at 276–80; *Bellamy*, 914 F.3d at 745. It has also long been "clearly established under Supreme Court and Second Circuit case law that the Government has a duty to disclose…exculpatory and impeachment evidence." *Poventud v. City of New York*, 07-cv-3998, 2015 WL 1062186, at *8 (S.D.N.Y. Mar. 9, 2015); *see also Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) (recognizing a cause of action against police for suppressing exculpatory evidence from the prosecution).

Citing no cases supporting their position, Defendants make a cursory argument that they could have believed the identification procedures they conducted were fair, and the evidence they suppressed was not exculpatory. This is counterfactual—Defendants agreed they understood they could not show single or even two or three photos to a witness, and all agreed they understood they had to disclose all witness statements to the prosecutor. Their defense is not that they made a good faith mistake; their defense is that they didn't engage in this conduct, and that the witnesses who say they did are all lying. Given the facts established by Plaintiff's evidence, Defendants actions were clearly wrong, and qualified immunity is not available.

## II.  Defendants maliciously prosecuted Plaintiff.

Both Plaintiff's § 1983 and state law malicious prosecution claims require proof of the following four elements: (1) initiation or continuation of a criminal proceeding; (2) favorable termination of that proceeding; (3) lack of probable cause; and (4) malice. *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010); *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003);

*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). Both should proceed here.

### A.    Defendants lacked probable cause.

"Although a grand jury indictment gives rise to a presumption that probable cause exists…that…presumption may be rebutted by evidence of various wrongful acts on the part of police." *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006). Specifically, Plaintiff can rebut the presumption of probable cause by showing police "failed to make a complete and full statement of facts to the District Attorney, misrepresented or falsified evidence, withheld evidence or otherwise acted in bad faith," *Manganiello*, 612 F.3d at 160–63 (internal quotation marks omitted); *see also Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003); *Colon*, 60 N.Y.2d at 82–83, or by showing that the police "failed to make further inquiry when a reasonable person would have done so," *Haynes v. City of New York*, 29 A.D. 3d 521, 523 (2d Dep't 2006) 2d Dep't 2006); or by showing "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures,'" *Vazquez v. City of New York*, No. 10-cv-6277(JMF), 2014 WL 4388497, at *9 (S.D.N.Y. Sept. 5, 2014). Although Plaintiff need only provide proof of any *one* of the forms of police misconduct to rebut the presumption of probable cause, the record—the series of undisclosed identification procedures, suppressions of exculpatory evidence, fabrications of evidence, failure to investigate, and pervasive police deception—meets *all* of them.[12]

---

[12] Because Defendants' misconduct touched all evidence inculpating Rosario, the grand jury was necessarily misled. Further, the BCDAO, Defendants' client, has the grand jury minutes, refused to produce them, and opposed Plaintiff's unsealing application in Bronx Supreme Court. (That motion remains pending.) If the Court views the grand jury minutes as essential to summary judgment, the proper remedy would be to order the grand jury minutes unsealed and the Defendants to produce them. *See* Fed. R. Civ. P. 56(d)(3); *Anilao v. Spota*, 918 F. Supp. 2d 157, 170–71 (E.D.N.Y. 2013) (holding that plaintiff must first petition the state court to unseal grand jury minutes but if that fails, the district court may order the unsealing.).

The only thing Defendants contend creates probable cause is the alleged identifications by Sanchez, Davis, and Diaz. But the jury can conclude the Diaz identification never happened and all three identification procedures were so suggestive they cannot be relied upon. *See Stansbury*, 721 F.3d at 90–91 (holding two positive identifications from single photographs were "too problematic…to provide probable cause" on their own); *Dufort*, 874 F.3d at 348 (holding identification from unduly suggestive procedure "should not factor into any probable cause analysis"). Furthermore, "[r]eview for probable cause should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury*, 721 F.3d at 93. Here, Defendants were aware of "plainly exculpatory" evidence including information from Nicole Torres that the shooter knew the victim and she did not recognize Rosario as the shooter, as well as evidence that Rosario *couldn't* have been the shooter because he was in Florida at the time of the crime. P92. A reasonable jury could plainly find there was no probable cause. *See Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) ("Where the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence *vel non* of probable cause is to be decided by the jury.").

### B. The prosecution terminated in Plaintiff's favor.

Despite losing this same argument in their Rule 12 motion, Defendants reprise their assertion that Rosario's proceeding did not terminate favorably as that term is construed under federal law.[13] As the Court has already ruled, "[n]o single type of disposition is necessary or

---

[13] Although Defendants' brief does not specify, the argument they make pertains only to the § 1983 malicious prosecution claim. As this Court has already held: "The favorable termination prong under New York law is more lenient than under federal law" requiring only "a final termination of the criminal proceeding [that] is not inconsistent with the Plaintiff's innocence." D.E. 146 at 17 (quoting *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018)) (emphasis removed)). There is no dispute the state law favorable termination standard is met.

sufficient, but the termination must be measured in objective terms by examining the totality of

the circumstances." D.E. 146 at 8 (internal quotation marks omitted). "[T]he dispositive inquiry

is whether the failure to proceed implies a lack of reasonable grounds for the prosecution"; if so,

the termination is favorable. *Murphy*, 118 F.3d at 948 (internal quotation marks omitted). In most

cases, the prosecutor's independent decision to abandon a prosecution "compels an inference"

that such grounds were lacking. *Id.* at 949–50 (applying this reasoning to a speedy trial

dismissal); *see also Spak v. Phillips*, 857 F.3d 458, 463 (2d Cir. 2017) ("[A]s a general matter a

*nolle prosequi* constitutes a 'favorable termination' for the purpose of determining when a

Section 1983 claim accrues."); Restatement (Second) of Torts § 659(c) (favorable termination

met by "the formal abandonment of the proceedings by the public prosecutor").[14]

The evidence more than "compels an inference" that the prosecutors lacked "a reasonable

grounds for the prosecution," *Murphy*, 118 F.3d at 949—the prosecution explicitly stated as

much. The prosecution consented to vacatur because Rosario's defense attorney had failed to

present compelling evidence of his innocence, and then moved to dismiss the indictment after a

reinvestigation that showed insufficient evidence to retry Rosario. Its dismissal motion explicitly

stated that the reason for abandoning the prosecution was that it expected to lose at trial:

> In the end, the People believe that we would not be able to meet our burden at trial
> of proving the defendant's guilt beyond a reasonable doubt to the satisfaction of a
> unanimous jury. Where, as here, the People assert that *an acquittal is likely*, no
> valid purpose would be served by expending the resources of this Court[.]

P122 (emphasis added). In other words, the prosecution stated explicitly what was implicit in

*Murphy*'s speedy trial dismissal or *Spak*'s *nolle prosequi*: it had no reasonable grounds for

prosecution. *Murphy*, 118 F.3d at 949; *Spak*, 857 F.3d at 463; *see also Chimurenga v. City of*

---

[14] Defendants also reprise their claim—already rejected by this Court—that Rosario must show
actual innocence to prove favorable termination. This attempt to raise the bar on favorable
termination has no basis in case law.

*New York*, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999) (observing that there are "circumstances in which even a bare voluntary dismissal may, in context, indicate the innocence of the accused").[15]

### C.    Defendants initiated the prosecution against Plaintiff.

A "jury may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared…alleged false [evidence] and forwarded it to prosecutors." *Manganiello*, 612 F.3d at 163. Because there is sufficient evidence to conclude that Silverman, Whitaker, Martinez, and Cruger each "actively elicited inculpatory statements from witnesses…whose veracity in making such statements was circumstantially suspect," "forwarded those statements to the ADA," and testified in pretrial and trial proceedings, Plaintiff has satisfied this element. *Id.*

### D.    Malice can be inferred from a lack of probable cause.

Abundant evidence demonstrates malice. "A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78. Malice may also be shown "by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996). Aside from the evidence that Defendants lacked probable cause to prosecute Rosario, malice can also be shown through the repeated misconduct of each Defendant, as well as Defendants' "apparently myopic focus on" Rosario—jumping to the conclusion based on Silverman's hunch Rosario was the shooter and failing to investigate his alibi. *See Manganiello*, 612 F.3d at 164.

### E.    Defendants are not entitled to qualified immunity for their malicious prosecution of Plaintiff.

Finally, Defendants claim they are entitled to qualified immunity on the § 1983 malicious prosecution claim, asserting they had at least "arguable" probable cause. But as the Second

---

[15] Defendants assert that Rosario's dismissal was the result of a "compromise." But the only "compromise" Rosario offered in exchange for full vacatur of his conviction and dismissal of the indictment was to abandon an appeal seeking precisely that relief.

Circuit held in *Dufort*, evidence of Defendants' intentional misconduct throughout the investigation makes qualified immunity inappropriate:

> Dufort has established a dispute of material fact as to whether the Defendants intentionally withheld or manipulated key evidence during his arrest and prosecution. He has introduced sufficient evidence from which a reasonable jury could conclude that the Defendants placed him in a deeply defective lineup, … and then withheld the suspect nature of this identification from prosecutors and the grand jury. Such a "knowing" violation of his Fourth and Fifth Amendment rights would, if proven, be enough to overcome the protection of qualified immunity.

874 F.3d at 354. That controls here, given Plaintiff's ample evidence of misconduct.

## III.   There is no basis to dismiss Plaintiff's respondeat superior claim.

Defendants' only argument regarding the respondeat claim against the City is that it should be dismissed if Plaintiff's state law malicious prosecution claim is dismissed. Given that there is no basis to dismiss the malicious prosecution claim, the respondeat claim is also sound.

## IV.   There is no basis to dismiss Plaintiff's failure to intervene claims.

Defendants concede that they may be held liable if they had knowledge of a constitutional violation and the opportunity to intervene but failed to do so. D.E. 169 at 39. They merely dispute the facts, claiming there were no constitutional violations and that none of the Defendants knew what the others were doing. But the Defendants admit that they were communicating about every important development in the case, and the jury can conclude that each Defendant knew about but disregarded open misconduct. P7. At this stage, Plaintiff may bring both affirmative misconduct claims and failure to intervene "in the alternative, even if they are inconsistent." *Buchy v. City of White Plains*, 14 CV 1806 (VB), 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015) (citing Fed. R. Civ. P. 8(d)(2), (3)).


Dated:  New York, New York
        February 21, 2020

Respectfully submitted,

**/s/ Nick Brustin**
Nick Brustin
Emma Freudenberger
Anna Benvenutti Hoffmann
Richard Sawyer
Avinash Nitin Samarth
Neufeld Scheck & Brustin, LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
(212) 965-9081

*Attorneys for Plaintiff Richard Rosario*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I delivered the foregoing *Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment* to all counsel of record by ECF on February 21, 2020.

Respectfully submitted,

**<u>/s/ Alison Fraerman</u>**
*Paralegal, Neufeld Scheck & Brustin, LLP*
