**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

RICHARD ROSARIO,

              Plaintiff,

  -against-

THE CITY OF NEW YORK, *et al.*,

           Defendants.

---

18-cv-4023 (LGS)

**March 22, 2021**

**<u>Memorandum of Law in Opposition to Defendants' Motion to Preclude the Expert
Opinions of Jennifer Dysart, Ph.D. and Bhushan S. Agharkar, M.D.</u>**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

I.    Introduction ........................................................................................................... 1

II.   Standard of Review ............................................................................................... 2

  A.    There is no basis to exclude or limit the testimony of Dr. Dysart................................... 3

    1.    Dr. Dysart is exceptionally well-qualified in her field. ................................................ 4

    2.    Dr. Dysart's testimony is relevant and will assist the jury. ......................................... 5

    3.    Dr. Dysart's testimony is reliable and well-supported by research........................... 10

  B.    There is no basis to exclude or limit the testimony of Dr. Agharkar. ........................... 11

    1.    Dr. Agharkar considered all of the DSM-5's diagnostic criteria for PTSD. .............. 12

    2.    Dr. Agharkar conducted a differential diagnosis of Mr. Rosario's brain injury. ....... 15

    3.    Dr. Agharkar did not diagnose Mr. Rosario with Panic Disorder. ............................ 19

    4.    Defendants' remaining arguments lack merit............................................................ 20

III.    Conclusion ......................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Adeghe v. Janssen Pharm., Inc.*, No. 16-CV-2235 (LGS),
2017 WL 3741310 (S.D.N.Y. Aug. 30, 2017) ............................................................................ 18

*Amorgianos v. Nat'l R.R. Pass. Corp.,* 303 F.3d 256 (2d Cir. 2002) ...................................... 9, 11

*Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936 (KMW),
2011 WL 1674796 (S.D.N.Y. May 2, 2011) ............................................................................. 15

*Bah v. City of New York*, No. 13-CV-6690 (PKC),
2017 WL 435823 (S.D.N.Y. Jan. 31, 2017) ................................................................................ 8

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) .................................................. 7

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd.*,
769 F. Supp. 2d 269 (S.D.N.Y. 2011) ........................................................................................ 14

*Daniels v. City of New York*, No. 16-CV-9080 (AJN),
2018 WL 5919307 (S.D.N.Y. Nov. 13, 2018) .............................................................................. 7

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) .............................................. 2, 3, 7

*Davids v. Novartis Pharm. Corp.*, 857 F. Supp. 2d 267 (E.D.N.Y. 2012) ........................... 16, 19

*El Ansari v. Graham*, No. 17-CV-3963 (VEC), 2019 WL 3526714 (S.D.N.Y. Aug. 2, 2019).... 18

*Harkabi v. SanDisk Corp.*, No. 08-CV-8203 (WHP),
2012 WL 2574717 (S.D.N.Y. June 20, 2012) ...................................................................... 12, 14

*Ismael v. Charles*, No. 18-CV-3597 (GHW),
2020 WL 4003291 (S.D.N.Y. July 15, 2020) ....................................................................... 18, 19

*Jones v. Cannizzaro*, --- F. Supp. 3d ---, 2021 WL 218040 (E.D. La. Jan. 21, 2021) .............. 6, 10

*Joseph S. v. Hogan*, No. 06-CV-1042 (BMC) (SMG),
2011 WL 2848330 (E.D.N.Y. July 15, 2011) ....................................................................... 13, 15

*Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) ........................................................ 8

*Matthews v. Hewlett-Packard Co.*, No. 15-CV-3922 (DAB),
2017 WL 6804075 (S.D.N.Y. Dec. 22, 2017) ............................................................... 16

*Monterey v. City of New York*, No. 17-CV-4477 (VEC),
2019 WL 5884466 (S.D.N.Y. Nov. 12, 2019)........................................................ 18, 19

*Moore v. Keller*, No. 16-CV-1230, 2020 WL 6384691 (N.D.N.Y. Oct. 29, 2020)..................... 14

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005)........................................................ 2, 3

*Phelps v. CBS Corp.*, No. 17-CV-8361 (AJN),
2020 WL 7028954 (S.D.N.Y. Nov. 30, 2020)............................................................... 2

*Phillips v. Allen*, 668 F.3d 912 (7th Cir. 2012)............................................................... 7

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017)........................................... 3, 6, 8, 11

*Royal Ins. Co. of Am. v. Joseph Daniel Const., Inc.*,
208 F. Supp. 2d 423 (S.D.N.Y. 2002)............................................................... 2

*Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249 (2d Cir. 2005) ........................................... 15, 19

*Tardif v. City of New York*, 344 F. Supp. 3d 579 (S.D.N.Y. 2018) ............................................. 16

*Tchatat v. City of New York*, 315 F.R.D. 441 (S.D.N.Y. 2016).................................................... 19

*Thompson v. Doane Pet Care Co.*, 470 F.3d 1201 (6th Cir. 2006) ............................................ 14

*United States v. Brownlee*, 454 F.3d 131 (3d Cir. 2006) .......................................................... 6, 9

*United States v. Nolan*, 956 F.3d 71 (2d Cir. 2020)................................................................ 3, 6, 9

*United States v. Smith*, 621 F. Supp. 2d 1207 (M.D. Ala. 2009)................................................... 6

*United States v. Smithers*, 212 F.3d 306 (6th Cir. 2000) ........................................................... 10

*Walsh v. Chez,* 583 F.3d 990 (7th Cir. 2009)........................................................................... 12

*Whalen v. CSX Trans., Inc.*, No. 13-CV-3784 (LGS) (HBP),
2016 WL 5660381 (S.D.N.Y. Sept. 29, 2016)............................................................... 14

*Young v. Conway*, 698 F.3d 69 (2d Cir. 2012) ............................................................... 3

**Other Authorities**

Fed. R. Civ. P. 26(a)(2)(B)(ii) ................................................................. 10

Fed. R. Evid. 401 .................................................................................... 9

Fed. R. Evid. 702 Advisory Comm. Notes ............................................... 8

Fed. R. Evid. 702 .............................................................................. 2, 10

Fed. R. Evid. 703 .................................................................................. 16

Fed. R. Evid. 704(a) ................................................................................ 8

## I.     Introduction

Faced with well-founded and obviously admissible core opinions from two leading experts in their fields, Defendants grasp at straws to come up with a colorable *Daubert* challenge. Their efforts fail. As numerous courts have found, Jennifer Dysart, Ph.D., a nationally renowned expert in eyewitness identifications, is abundantly qualified to testify to the counter-intuitive scientific principles underlying the reliability of eyewitness identification testimony. And forensic psychiatrist Bhushan S. Agharkar, M.D., a distinguished fellow of the American Psychiatric Association with over twenty years of clinical experience and formidable academic credentials, based his opinions on six hours of face-to-face clinical evaluations of Plaintiff Richard Rosario, extensive interviews with multiple collateral sources, hundreds of pages of records, and virtually all of the existing academic literature on the psychological impacts of wrongful convictions. Despite conceding both experts' qualifications, Defendants nevertheless seek to exclude their proffered opinion testimony in its entirety. There is nothing approaching a basis to do so; the admissibility of these expert opinions is simply not a close call.

Defendants try to craft an objection to Dr. Dysart's testimony on the grounds that some of her opinions are premised on a factual assumption of Mr. Rosario's innocence. What they mean is, while expressly refusing to opine on Plaintiff's innocence, Dr. Dysart explains how well-established social science principles would apply to various factual scenarios the jury could find occurred here. In particular, Dr. Dysart will explain to the jury why—*if the jury credits the evidence that Mr. Rosario is innocent*—three independent witnesses were unlikely to have accidentally selected the same wrong man from hundreds of photographs without outside influence. This is precisely what an expert is *supposed* to do: identify factual issues reserved for the jury's consideration and offer opinions that fit a set of facts the jury could find. *See, e.g.*,

*Phelps v. CBS Corp.*, No. 17-CV-8361 (AJN), 2020 WL 7028954, at *10 (S.D.N.Y. Nov. 30, 2020) ("It is commonplace to have expert witnesses testify to his or her opinion 'based on a set of assumed facts'—facts elicited elsewhere in the record."); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (describing requirement that "expert testimony…is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute," also described as "fit") (internal citations and quotations omitted).

Defendants' objections to Dr. Agharkar's testimony are even more half-hearted. Dr. Agharkar, a highly-credentialed expert in his field, disclosed a highly-detailed 16-page report and employed a rigorous methodology going well beyond what clinical psychiatry requires— indeed, well beyond what Defendants' own experts did to reach their proffered opinions. His decision not to explicitly list every condition he ruled out in reaching his diagnoses does not render his opinions unreliable. Defendants may address any disagreements with his ultimate conclusions that Mr. Rosario suffers from Post-Traumatic Stress Disorder ("PTSD") and symptoms consistent with acquired brain injury from blows to the head in prison via cross-examination or competing expert testimony. But his opinions easily surpass the low bar for admission. Defendants' motion should be denied.

## II.    Standard of Review

To admit an expert's testimony, the Court must find three things: that the expert is qualified, that their testimony is relevant, and that it is reliable. *See Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005); *see also* Fed. R. Evid. 702. "Once the thresholds of reliability and relevance are met, the testimony is admissible." *Royal Ins. Co. of Am. v. Joseph Daniel Const., Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002); other challenges generally "go to the weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577

(2d Cir. 2017) (quotations omitted); *see also Daubert* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The Court's "determinations regarding the admissibility of expert testimony are…reviewed for abuse of discretion." *Nimely*, 414 F.3d at 393 (cleaned up).

## A.  There is no basis to exclude or limit the testimony of Dr. Dysart.

Eyewitness identification expert testimony is regularly admitted because it aids the jury's understanding of several counterintuitive phenomena. *See, e.g.*, *Young v. Conway*, 698 F.3d 69, 88 (2d Cir. 2012) ("Studies…suggest that jurors tend to overestimate the likely accuracy of eyewitness evidence…because many of the scientific principles underlying the reliability of eyewitness testimony are counter-intuitive or do not comport with common sense." (cleaned up)); *United States v. Nolan*, 956 F.3d 71, 80–82 (2d Cir. 2020) (same). Plaintiff's expert Jennifer Dysart, Ph.D., one of the country's most distinguished experts in eyewitness misidentification, has been consistently qualified by courts to opine on factors influencing the accuracy and reliability of eyewitness identifications.

Dr. Dysart's testimony is relevant here for two reasons. First, despite the overwhelming evidence that Mr. Rosario was in Florida at the time of the underlying murders, Defendants intend to argue he is actually guilty based primarily on the (now well-disputed) stranger identifications of him. Dr. Dysart's description of the counter-intuitive factors that influence the reliability of identifications will help the jury assess that identification evidence in choosing whether to credit those identifications over the ample evidence that Mr. Rosario was in Florida. Second, Dr. Dysart's description of police identification procedures—including how they are commonly used and their effects—will provide crucial context to the jury as it considers

Plaintiff's § 1983 claims relating to the identification procedures Defendants claim they conducted; for example, how likely is it that three individuals would independently select Mr. Rosario's photograph from among hundreds without suggestion if he in fact was not the man they saw. Finally, Dr. Dysart's proposed testimony is based on extraordinarily well-supported social science—including peer-reviewed research she herself conducted—and represents broad consensus in the field; it is patently reliable. Defendants' objections to the admission of her testimony are all without merit.

   **1.  Dr. Dysart is exceptionally well-qualified in her field.**

   Although Defendants wisely do not challenge Dr. Dysart's qualifications as an expert on eyewitness identifications, DE-211 at 9, it is relevant that Dr. Dysart is among a handful of the country's most qualified experts in eyewitness misidentification, a field that encompasses both the psychology of memory *and* police practices' effect on eyewitness memory. She holds a Ph.D. in Social Psychology and is a tenured professor at John Jay College of Criminal Justice of the City University of New York. Ex. 1, Report of Jennifer Dysart, Ph.D., dated May 10, 2019 (Dysart Rep.) at 29. She is the co-author of a leading treatise, more than a dozen peer-reviewed articles, and four published book chapters on the topic. *Id.* at 31. She has also *taught* police investigators how to conduct eyewitness identification procedures in conferences across the country, including in New York City. Dr. Dysart has testified as an expert in dozens of criminal, civil, and post-conviction proceedings; not a single court in the nation has ever held that she lacks the necessary qualifications to testify about these issues. Defendants' only argument on this point is a puzzling strawman: that Plaintiff offers Dr. Dysart as a general "police practices" expert or an "expert in NYPD police practices or police training." DE-211 at 8–9. Not so; the only police practices Dr. Dysart opines on are police identification procedures—which are squarely within her field of expertise. Indeed, as her report makes clear, studying police

4

interview protocols and procedures is one of two key areas of research in her field. *See* Ex. 1 (Dysart Rep.) at 7–8 (discussing "systems variables," as the variables "under the control of law enforcement"). Her experience reviewing identification procedures from across the country has qualified her to co-author a treatise and to train law enforcement on identification procedures; it certainly qualifies her to testify in this case.[1]

### 2. Dr. Dysart's testimony is relevant and will assist the jury.

As the briefing to date makes clear, at trial in this case, the parties will present two diametrically opposed views of the facts: Plaintiff will present evidence that he is innocent and was falsely identified by three eyewitnesses as a result of Defendants' unnecessarily and impermissibly suggestive identification procedures. Defendants, on the other hand, will claim there was no police misconduct and that Mr. Rosario was identified from hundreds of photographs of similar-looking Hispanic men because he is guilty. Dr. Dysart's expert opinion is directly relevant and helpful to the jury's consideration of these competing claims in two ways: First, Dr. Dysart will explain the well-established phenomenon of eyewitness misidentification—

---

[1] Boiled down, Defendants' broad qualification argument appears actually to be a misplaced challenge to Dr. Dysart's conclusion that Defendants departed from standard police procedure when they used "mugshot searching" rather than a photo array after having a specific suspect in mind. *See* DE-211 at 10. Given Dr. Dysart's base of knowledge and own research on this topic, she is fully capable of opining on how the use of mugshot searching under these circumstances departed from standard procedure. But it's even more straightforward here: as her report and testimony make clear, the NYPD's own 1992 policy and testimony from Detective Charles Cruger both confirmed that mugbooks should not be used after a suspect has been identified. Ex. 1 (Dysart Rep.) at 14; Ex. 2, Deposition of Jennifer Dysart, Ph.D., dated Oct. 17, 2019 (Dysart Dep.) at 73:25–75:3, 112:14–113:2. And Defendants' own expert (who they have decided not to call) agrees: "[I]deally once Mr. Sanchez identified the suspect out of the photobook, a photo lineup should have been assembled and administered." Ex. 3, Report of Laura Mickes, Ph.D., dated Aug 24, 2019 (Mickes Rep.) at 19. Defendants' argument that Dr. Dysart should have re-read the NYPD patrol guide—instead of relying on her prior knowledge of it and Defendants' testimony about the applicable policies in this case—is at best an area for cross-examination, especially as there is no dispute as to whether Dr. Dysart's characterization of the relevant policies is accurate.

including by witnesses who remain convinced of their erroneous identifications even after new evidence of the accused's innocence comes to light—and the numerous, counterintuitive factors present in this case that increase the likelihood Mr. Rosario was misidentified. Although Defendants assert such testimony is "not helpful" because it's "common sense," DE-211 at 15–16, the Second Circuit last year found precisely the opposite: "[a] lay juror would not know…about the likely impact on perception of extreme stress and weapon focus[.]" *Nolan*, 956 F.3d at 82. Particularly since Defendants intend to argue that the jury should credit these identifications contrary to the science, Plaintiff would be unfairly prejudiced if he could not provide this context. *See, e.g.*, *Jones v. Cannizzaro*, --- F. Supp. 3d ---, 2021 WL 218040, at *4–5 (E.D. La. Jan. 21, 2021) (in § 1983 *Brady* case, admitting Dr. Dysart's eyewitness misidentification testimony as relevant); *see also United States v. Brownlee*, 454 F.3d 131, 142 (3d Cir. 2006) ("[W]hile science has firmly established the inherent unreliability of human perception and memory…this reality is outside the jury's common knowledge[.]" (cleaned up)); *United States v. Smith*, 621 F. Supp. 2d 1207, 1215 (M.D. Ala. 2009) ("The jury's decision-making process can be enhanced by learning how these factors combine to impact perception and memory.").[2]

Second, Dr. Dysart will provide relevant context around witnesses' differing accounts of the identification procedures used in this case, how/when those procedures are typically used, and the effect they have on a witness. This context, outside the jury's ken, will aid in evaluating competing accounts of what procedures were actually used here. *See Restivo*, 846 F.3d at 579–80

---

[2] For example, her testimony can help jurors understand the counterintuitive phenomenon of some eyewitnesses becoming *more* certain of their identifications over time, persisting even in the face of contrary evidence. *See, e.g.*, Ex. 1 (Dysart Rep.) at 18–19 (describing how post-event contamination "could explain why Davis…would believe, today, Rosario was the man who shot George Collazo despite his innocence").

(testimony about whether defendant's conduct was inconsistent with baseline police standards properly admitted in § 1983 wrongful conviction trial); *see also Phillips v. Allen*, 668 F.3d 912 (7th Cir. 2012) ("Without a solid basis in the social science of eyewitness identification, [one can]not appropriately" conclude that a given procedure "spoils an identification").

Defendants' primary complaint is that Dr. Dysart is improperly opining on Mr. Rosario's innocence. She is not. To the contrary, Dr. Dysart makes abundantly clear that she is not making any credibility determinations, *see, e.g.*, Ex. 1 (Dysart Rep.) at 4 ("I cannot make any credibility determinations."), and that she cannot testify as to innocence, *see, e.g.*, Ex. 2 (Dysart Dep.) at 43:25–44:1 ("I don't know whether Mr. Rosario is innocent or guilty."). But Defendants do not—and cannot—dispute that the *jury* could find that he is innocent, based on the testimony of numerous witnesses that he was in Florida at the time of the crime. That makes it proper for Dr. Dysart to accept his innocence as an express factual assumption so that she can offer her relevant expertise in a manner tailored to the facts of the case. *See, e.g.*, *Daniels v. City of New York*, No. 16-CV-9080 (AJN), 2018 WL 5919307, at *3–4 (S.D.N.Y. Nov. 13, 2018) (describing how experts can assume a version of the facts supported by some evidence—such as whether the plaintiff ran a red light—even if other evidence contradicts it). The proper way for Defendants to address this assumption is on cross examination, *id.* at *4; it does not provide any basis to exclude Dr. Dysart's testimony. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (expert testimony may be excluded based on improper factual assumptions only if they are "speculative or conjectural" or "so unrealistic and contradictory as to suggest bad faith").[3]

---

[3] While Defendants couch this as an argument about reliability, DE 211 at 10–11, that appears to stem from the misconception that Dr. Dysart is offering an expert opinion that Mr. Rosario is innocent—which she expressly states she is not. The fit between the factual assumptions Dr. Dysart makes as a basis for her opinions and the record in this case is more properly considered as whether the opinions are relevant or helpful to the jury. *See Daubert*, 509 U.S. at 591.

Nor does Dr. Dysart offer improper legal conclusions. Yet again, Defendants appear to confound the standards; in a civil case "opinion testimony that is otherwise admissible is not objectionable merely because it 'embraces an ultimate issue to be decided by the factfinder.'" *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) (quoting Fed. R. Evid. 704(a)); *see also* Fed. R. Evid. 702 Advisory Comm. Notes (noting the basic purpose of expert opinion testimony is to provide "the inference which should be drawn from applying the [expert's] specialized knowledge to the facts.").

Dr. Dysart offers testimony—based on her extensive expertise—on what the relevant social science says about the likelihood that, absent improper suggestion, three separate eyewitnesses would independently identify the same suspect after reviewing hundreds of photographs (highly unlikely) as well as the likelihood of that occurring, absent improper suggestion, if the identified suspect were innocent (nearly impossible). *See* Ex. 1 (Dysart Rep.) at 4–5, 27; Ex. 2 (Dysart Dep.) at 55:22–56:17 (explaining relevant factors present in this case rendering "it extremely unlikely that three independent witnesses would pick the right guy from the procedure, let alone the same person from the identification procedure unless…it was suggestive in some way"); Ex. 4, Deposition of Laura Mickes, Ph.D., dated Sept. 26, 2019, at 276:14–277:9 (agreeing research indicates that identification by three people of the same guilty suspect under these circumstances is "very unlikely"). That this testimony has "direct implications for applying legal standards…is exactly why [t]his testimony [is] relevant." *Restivo*, 846 F.3d at 580 (quotations omitted). It does not provide any basis to exclude the testimony. *See, e.g.*, *Bah v. City of New York*, No. 13-CV-6690 (PKC), 2017 WL 435823, at *10 (S.D.N.Y. Jan. 31, 2017) (rejecting City's argument that plaintiff's expert opinion that officer's account was contradicted by science improperly commented on credibility).

Defendants' remaining relevancy arguments also fail. *See* DE-211 at 16–17. For opinion testimony to be relevant, it need only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable…than it would be without the evidence." *Amorgianos v. Nat'l R.R. Pass. Corp.,* 303 F.3d 256, 265 (2d Cir. 2002) (quotations omitted); Fed. R. Evid. 401. So, for example, Defendants' use of a suggestive show-up procedure with Nicole Torres is relevant to both Plaintiff's innocence and his misconduct claims even though she did not testify at his criminal trial. As Dr. Dysart explains—and Defendants' expert agrees—show-up identification procedures (*i.e.*, displaying a single suspect photo) are "extremely suggestive" and should only be used in "exigent circumstances." Ex. 1 (Dysart Rep.) at 26; Ex. 3 (Mickes Rep.) at 23 ("I agree with Professor Dysart's assessment of the findings on showup procedures… [S]howups are suggestive by nature because it is clear that the person is the police suspect."). Dr. Dysart's testimony on this point bears directly on the exculpatory value of Ms. Torres not identifying Mr. Rosario as the shooter (if the jury concludes that happened). Moreover, if the jury credits Ms. Torres, then Dr. Dysart's testimony is also relevant as circumstantial evidence that Defendants used the same improperly suggestive procedure with other witnesses who did testify.

Similarly, while this is not a case involving DNA, studies of eyewitness identifications in DNA-exoneration cases are nonetheless relevant because they empirically prove that "there have been an overwhelming number of false convictions stemming from uninformed reliance on eyewitness misidentifications." *Brownlee*, 454 F.3d at 141–42 (3d Cir. 2006); *see also, e.g.*, *Nolan*, 956 F.3d at 75 (observing that "eyewitness misidentification was present in an astonishing 71[%] of the cases in which subsequent DNA testing established the factual innocence of wrongfully convicted defendants"). Here—regardless of the *type* of evidence

9

Plaintiff will use to prove innocence—there is no dispute his conviction was based on eyewitness (mis)identifications; studies proving this phenomenon are therefore patently relevant.[4]

### 3. Dr. Dysart's testimony is reliable and well-supported by research.

The theories underlying Dr. Dysart's eyewitness misidentification testimony meet any definition of reliability: they have been well-tested in peer-reviewed publications, including in articles published by Dr. Dysart, *see, e.g.*, Ex. 1 (Dysart Rep.) at 30–31 (listing 18 peer-reviewed articles), and it is beyond dispute that Dr. Dysart has a relevant degree and decades of experience in the field, *see id.* at 5–6, 29–50; *see also* Fed. R. Evid. 702 (permitting opinion testimony based on "knowledge, skill, experience, training, or education").

For her "opinions on how the facts of Plaintiff's case may have affected the accuracy of witness identification," Dr. Dysart is relying "on a body of research and her experience in the field of eyewitness identification to opine on how the witness identification[s] in this case [were] influenced by…procedures actually used and the opportunities that the witnesses had to see the perpetrator." *Jones*, 2021 WL 218040, at *4 (admitting Dr. Dysart's testimony as reliable). This is paradigmatically sound methodology. Notably, Defendants do not identify a single reason why Dr. Dysart's method of relying on her research and experience, relevant literature, case studies, historical and contemporary police practices, and exoneration data is unreliable. *See* DE-211 at 10–14. That's because they cannot. *See, e.g., United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000) ("[T]he science of eyewitness perception has achieved the level of exactness, methodology, and reliability of any psychological research." (quotations omitted)); *Young*, 698 F.3d at 78–79 (discussing the "extensive body of scientific literature" in this field and further

---

[4] Defendants' complaint that the first four pages of her report "regurgitat[e] the testimony of other witnesses" is equally meritless. DE-211 at 15. Dr. Dysart was required to lay out the "the facts or data" she considered in forming her opinions. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii). Had she failed to recount this evidence in detail, no doubt Defendants would now be challenging that.

observing that this research "has been reviewed, replicated, and retested, and is generally accepted in the research community").

Defendants' final argument—that Dr. Dysart's "opinion is unsupported by science," DE-211 at 13–14—borders on the absurd. As Defendants immediately concede, they are not in fact arguing that the "scientific proof" or "studies" do not exist, *id.*, but instead that, in a few instances throughout Dr. Dysart's 27-page report, she did not provide a specific citation. But an expert need not back "her opinion with published studies that unequivocally support … her conclusions" for it to be admissible, *Amorgianos*, 303 F.3d at 266, let alone provide a pincite for every sentence in her Rule 26 report. Indeed, "[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from ... specialized experience.'" *Restivo*, 846 F.3d at 576 (internal citations omitted). Here, of course, the relevant body of social science thoroughly supports Dr. Dysart's opinions on the three factors—post-event contamination, pre-identification instruction bias, and mugshot searching—Defendants purport to challenge.[5] And in both her reports and her deposition, Dr. Dysart provided ample description of the science on which her opinions are based. *See, e.g.*, Ex. 2 (Dysart Dep.) at 93:25–95:14, 114:2–115:6.

### B. There is no basis to exclude or limit the testimony of Dr. Agharkar.

Defendants do not challenge the qualifications of Plaintiff's psychiatric expert Bhushan S. Agharkar, M.D., *see* DE-211 at 18 n.6, or the obvious relevance of his testimony. Nor can they—Dr. Agharkar is a highly-respected forensic psychiatrist with decades of clinical

---

[5] Defendants' own expert agrees. *See* Ex. 3 (Mickes Rep.) 20 ("There is a large body of research to support [Dysart's] statement" regarding post-event contamination.); *id.* at 21 ("Many researchers do recommend giving these [pre-identification] instructions."); *id.* at 19 ("ideally" once a suspect was identified, "a photo lineup should have been assembled" rather than mugbook searching).

experience and a special interest and expertise in evaluating prison populations. *See* Ex. 5,

Report of Bhushan S. Agharkar, M.D., dated May 9, 2019 (Agharkar Rep.) at 1–2. His principal

opinions—that Mr. Rosario has Post-Traumatic Stress Disorder ("PTSD"), which "stems from

his experiences during incarceration" and "is considerably worsened by his being wrongfully

convicted," as well as an "acquired brain injury secondary to blow or blows on the head received

while in prison, considered a Mi[ld] Neurocognitive Disorder," *id.* at 14–15—are undeniably

relevant to the jury's damages assessment. Instead, Defendants style their motion largely as a

request to exclude his testimony in its entirety based on alleged defects in his diagnosis

methodology and nitpicks about the level of detail provided in his 16-page, single-spaced report.

None of Defendants' complaints are borne out by the record, nor do they provide a basis to

exclude any of Dr. Agharkar's opinions, let alone the entirety of his proffered testimony.

### 1. Dr. Agharkar considered all of the DSM-5's diagnostic criteria for PTSD.

Dr. Agharkar expressly states that he diagnosed Mr. Rosario with PTSD "[b]ased on my

clinical interview and review of collateral information" and "per the Diagnostic and Statistical

Manual – 5th Edition (DSM-5)." Ex. 1 (Agharkar Rep.) at 13. Nevertheless, Defendants

complain that Dr. Agharkar's 16-page, single-spaced report fails to discuss each of the eight

diagnostic criteria in sufficient detail, and that his diagnosis is excludable on that basis. DE-211

at 21–22. They do not cite a single authority suggesting that level of detail is required, for good

reason—it is not. "The purpose of an expert's report 'is not to replicate every word that the

expert might say on the stand,' but 'to convey the substance of the expert's opinion...so that the

opponent will be ready to rebut, cross-examine, and to offer a competing expert[.]'" *Harkabi v.*

*SanDisk Corp.*, No. 08-CV-8203 (WHP), 2012 WL 2574717, at *4 (S.D.N.Y. June 20, 2012)

(quoting *Walsh v. Chez,* 583 F.3d 990, 994 (7th Cir. 2009)). Indeed, "[n]othing in Rule 26(a)(2)

requires the expert report to contain all of the supporting data within its four corners so long as the report clearly explains its methodology[.]" *Joseph S. v. Hogan*, No. 06-CV-1042 (BMC) (SMG), 2011 WL 2848330, at *4 (E.D.N.Y. July 15, 2011).

In any event, even a cursory review of Dr. Agharkar's detailed report reveals he *did* consider each of the factors during his six hours of clinical interviews with Mr. Rosario and review of numerous other sources. For example, Defendants claim there is insufficient analysis of the second diagnostic criterion, which requires the presence of one or more intrusion symptoms. But the report explains how Mr. Rosario meets that criterion: "*[a]s representative examples*, his past nightmares and distressing dreams of being attacked, of being held helpless in darkness, and of beatings witnessed constitute re-experiencing symptoms of trauma." Ex. 5 (Agharkar Rep.) at 14 (emphasis added); *see also id.* at 7 (describing Mr. Rosario's nightmares in more detail). Distressing dreams related to the traumatic event are specifically set forth as an intrusion symptom. *See* Ex. 6 (DSM-5) at 271.[6]

As another example, Defendants assert Dr. Agharkar failed to consider the third criterion, which requires avoidance of stimuli associated with the trauma, *see* Ex. 6 (DSM-5) at 271. But that is simply not true; the report addresses this directly: "Mr. Rosario does not want to talk or think about what he has experienced when he was in prison as a way to avoid and shield himself from the psychological pain re-living such events would cause," Ex. 5 (Agharkar Rep.) at 14. Defendants entirely ignore this statement, *see* DE-211 at 22, as well as number of other discussions of Mr. Rosario's avoidance behaviors, *see e.g.*, Ex. 5 (Agharkar Rep.) at 5 ("He obtained a construction job shortly after his release from prison, but quit after one day because

---

[6] Elsewhere in his report, Dr. Agharkar describes Mr. Rosario's dissociation and psychological/physiological distress at trauma-related cues, all of which are also DSM-5 intrusion symptoms. *See, e.g.*, Ex. 5 (Agharkar Rep.) at 7–9; Ex. 6 (DSM-5) at 271.

members of the construction crew were people he knew from prison and he wanted to avoid their company."); *id.* at 8 (describing how, in order to avoid being "unexpectedly triggered by routine social interactions and anything that reminds him of his time in prison…he has been living in a self-imposed isolation that reproduces the isolation he experienced in prison"); *id.* at 9 ("He continues to have crying spells when he thinks about prison so he avoids it whenever possible."); *id.* at 10 (describing Mr. Rosario's wife's impressions of his self-imposed isolation). Notably, Defendants passed up the opportunity to depose Dr. Agharkar, the obvious forum for him to respond to these challenges.

Furthermore, an expert not only may, but is expected to, supplement his expert report through his trial testimony. *See, e.g.*, *Whalen v. CSX Trans., Inc.*, No. 13-CV-3784 (LGS) (HBP), 2016 WL 5660381, at *4 (S.D.N.Y. Sept. 29, 2016) ("Rule '26 (a)(2)(B) does not limit an expert's testimony simply to reading his report.... The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report.'" (quoting *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006))); *Harkabi*, 2012 WL 2574717, at *3 ("Numerous…courts in this district…hold that an expert can offer 'evidentiary detail' at trial for opinions expressed in the expert's report." (collecting cases)). And courts routinely allow experts to provide additional details regarding the opinions in their reports even prior to trial. *See, e.g.*, *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (allowing expert affidavit to be submitted with dispositive motions because it was "within the scope of the initial expert report"); *Moore v. Keller*, No. 16-CV-1230, 2020 WL 6384691, at *8–9 (N.D.N.Y. Oct. 29, 2020) (allowing expert affidavit submitted after close of discovery where it merely "provide[d] evidentiary details for opinions he ha[d] already expressed in his timely filed report") (quotations omitted).

14

Here, Dr. Agharkar's detailed report makes clear that he carefully considered each of the eight DSM-5 criteria for PTSD. Defendants' arguments at best go to the weight, not the admissibility, of Dr. Agharkar's testimony, and are more appropriately addressed at trial. *Arista Recs. LLC v. Lime Grp. LLC*, No. 06-CV-5936 (KMW), 2011 WL 1674796, at *7 (S.D.N.Y. May 2, 2011) ("Arguments about the assumptions and data underlying an expert's testimony go to the weight, rather than the admissibility, of that testimony."); *Joseph S.*, 2011 WL 2848330, at *2 ("In a jury trial, questions of reliability often go to weight rather than admissibility.").[7]

### 2. Dr. Agharkar conducted a differential diagnosis of Mr. Rosario's brain injury.

Defendants also argue that Dr. Agharkar failed to conduct a differential diagnosis en route to his conclusion that Mr. Rosario suffered from an "acquired brain injury secondary to blow or blows on the head received while in prison," which he considered a Mild Neurocognitive Disorder. Ex. 5 (Agharkar Rep.) at 14. But Defendants' apparent suggestion that Dr. Agharkar should have written down every cause he could have considered and dismissed—no matter how far-fetched—misunderstands what a differential diagnosis requires (and, apparently, what Rule 26 requires a psychiatric expert to write down).

A differential diagnosis is "a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (quotations omitted). However, "[a] medical expert's opinion based upon differential diagnosis normally

---

[7] This attempt to exclude Dr. Agharkar's PTSD diagnosis for an alleged failure to consider all of the DSM-5 diagnostic criteria is easily distinguishable from Plaintiff's own motion to exclude portions of Defendants' psychology experts' opinions. Defendants' experts admitted they had absolutely no evidence from which they could find that one of the DSM-5 criteria for an Antisocial Personality Disorder diagnosis had been met, *see* DE-208 at 10–11, whereas here, at best, Defendants' complaint is that Dr. Agharkar did not sufficiently explain the evidence on which he obviously relied, which is neither true nor required. In addition, their testimony about alleged personality disorders is not relevant and far more prejudicial than probative.

should not be excluded because the expert has failed to rule out every possible alternative cause[.]" *Davids v. Novartis Pharm. Corp.*, 857 F. Supp. 2d 267, 278 (E.D.N.Y. 2012) (quotations omitted)). Indeed, even a complete failure to perform a differential diagnosis is not fatal if, for example, there are "otherwise sufficient indicia of reliability." *Matthews v. Hewlett-Packard Co.*, No. 15-CV-3922 (DAB), 2017 WL 6804075, at *4 (S.D.N.Y. Dec. 22, 2017) (collecting cases); *see also Tardif v. City of New York*, 344 F. Supp. 3d 579, 601 (S.D.N.Y. 2018) ("[T]he absence of a differential diagnosis is not always fatal to an expert's causation opinion.").

Here, after observing that "Mr. Rosario did poorly on a number of neurological screenings," Dr. Agharkar "was concerned he ha[d] brain damage/dysfunction primarily in the frontal and temporal lobes," and referred him for additional testing by neuropsychologist Robert D. Shaffer, Ph.D. Ex. 5 (Agharkar Rep.) at 14. Dr. Shaffer administered a battery of neurocognitive tests, conducted a clinical interview, and reviewed symptom questionnaires before concluding that "[Mr. Rosario] suffers moderate brain impairment affecting functions mediated by the temporal and parietal lobes, with signs of impairment to frontal lobe functions as well. … primarily the result of repeated head injury with unconsciousness sustained while incarcerated." Ex. 7, Report of Robert D. Shaffer, Ph.D., dated May 3, 2019, at 1.[8]

It is abundantly clear that Dr. Shaffer conducted a differential diagnosis. He explained at length why the fact that Mr. Rosario performed poorly on a number of neuropsychological tests, but not fixed intellectual ability tests, indicated brain injury—in short, because "[t]he possibility that this represents an inborn (constitutional) variation of abilities would be extremely unlikely"

---

[8] Because a psychiatrist like Dr. Agharkar would "reasonably rely on" the testing and analysis of a neuropsychologist like Dr. Shaffer in reaching his own diagnosis, Dr. Agharkar can testify to these results whether or not Dr. Shaffer separately testifies. *See* Fed. R. Evid. 703. Nevertheless, Plaintiff can present Dr. Shaffer's expert testimony at trial as well, should the Court require it.

and "likely represents an acquired condition." Ex. 8, Supplemental Report of Robert D. Shaffer, Ph.D., at 3. And he considered the possibility that a different kind of brain injury was the source of Mr. Rosario's diminished brain function, but rejected that too. *Id.* ("Static injuries [like the reported blows to the head] are more likely to cause focal injuries with more specific loss of function, in contrast to acceleration/deceleration injuries (*e.g.*, car accidents), which tend to result in more diffuse injury to the brain and hence, more general and broadly-based loss of functions."). Similarly, Dr. Shaffer noted a whole range of Mr. Rosario's symptoms for which brain injury was a common source. *See, e.g., id.* ("hyperactive, fidgety behavior"); *id.* ("problems with shifting between visual and auditory data"); *id.* at 3–4 ("difficulty picking out previously presented visual information from a distractor"); *id.* at 5 ("Memory for events before and after a head blow are typically obscure due to the brain's inability to code information clearly, causing a range of amnesia. Confusion about what happened occurs particularly in environments such as prison where there is no trusted observer to describe the event, or doctor to explain what happened."). Dr. Agharkar's report indicates that he found these observations significant. *See* Ex. 5 (Agharkar Rep.) at 14 (flagging Dr. Shaffer's observation of "a cluster of dissociative symptoms as well as extreme difficulty on tests designed to measure frontal, temporal, and parietal lobe functioning," because "[d]amage/dysfunction to these parts of the brain often result[s] in problems with mood regulation, memory, impulse inhibition, rationally weighing and deliberating, organizing and sequencing thoughts and behaviors, seeing the 'big picture,' and exercising good judgement under stress"). Finally, Dr. Agharkar considered—and dismissed—the possibility that Mr. Rosario was malingering. Ex. 5 (Agharkar Rep.) at 15; Ex. 9, Supplemental Report of Bhushan S. Agharkar, M.D., dated Oct. 16, 2019, at 5.

Although he does not use the buzzword "differential diagnosis," it is clear that Dr. Agharkar utilized a methodology whereby he eliminated other potential causes.[9] He need not document each condition he ruled out in his expert report; given that those conditions are *per se* not relevant to Mr. Rosario's condition, it would be absurd to do so. Defendants cite no authority to support that any such requirement exists. Indeed, courts in this district routinely allow the testimony of experts who have conducted far less robust differential diagnoses than what Dr. Agharkar's report describes. *See, e.g.*, *Ismael v. Charles*, No. 18-CV-3597 (GHW), 2020 WL 4003291, at *17 (S.D.N.Y. July 15, 2020) (allowing testimony despite lack of explicit differential diagnosis based on expert's statement that there was "nothing in the medical records or history and physical examination to refute causality as related by the patient," because, while "not exactly a robust analysis, it shows that [he] did think about—and reject—alternative causes"); *Monterey v. City of New York*, No. 17-CV-4477 (VEC), 2019 WL 5884466, at *6 (S.D.N.Y. Nov. 12, 2019) (allowing testimony where differential diagnosis consisted of "implicitly eliminat[ing]" other potential causes by stating that the injury would be unusual "unless there has been trauma with sudden force"); *Adeghe v. Janssen Pharm., Inc.*, No. 16-CV-2235 (LGS), 2017 WL 3741310, at *4 (S.D.N.Y. Aug. 30, 2017) (allowing differential diagnosis based on review of medical records, pictures/measurements of the patient, and the temporal proximity between his exposure to the alleged cause and the condition, even though expert had not personally examined the plaintiff); *cf. El Ansari v. Graham*, No. 17-CV-3963 (VEC), 2019 WL 3526714, at *6–7 (S.D.N.Y. Aug. 2, 2019) (excluding differential diagnosis because expert

---

[9] To the extent Defendants are suggesting that an expert must explicitly describe his process using that terminology, it bears noting that neither their psychiatrist nor their neuropsychologist experts did so, despite each diagnosing him with multiple disorders. *See* DE-207-2, DE-207-3, DE-207-7, and DE-207-9.

completely failed to consider postpartum depression as a cause of patient's depression despite the fact that she was six months postpartum). And, in any event, "[d]isputes as to … faults in [an expert's] use of differential etiology as a methodology … go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995);[10] *see also Davids*, 857 F. Supp. 2d at 279 ("To the extent [the defendant] argues that [the expert] did not adequately rule out additional factors … these are credibility determinations that go to the weight and not the admissibility of his opinions.").

### 3. Dr. Agharkar did not diagnose Mr. Rosario with Panic Disorder.

Finally, Defendants' argument that Dr. Agharkar should not be allowed to testify regarding his "diagnosis" of Panic Disorder is entirely inapposite. By Dr. Agharkar's own admission, he made no such diagnosis. Ex. 5 (Agharkar Rep.) at 14 ("Mr. Rosario has also developed a number of symptoms consistent with Panic Disorder in that he will have panic attacks that last for a few minutes in which he is anxious, sweaty, jittery, gets short of breath, and has a sense of impending doom. *Whether this is a separate disorder or a reaction to the trauma he has experienced is not clear to me at this time*, but these anxiety symptoms only occurred after his wrongful conviction and appear related to his prison experience.") (emphasis added). Dr. Agharkar is clearly qualified to testify to each of Mr. Rosario's symptoms, and Defendants make no argument to exclude that testimony.

---

[10] Although the Second Circuit subsequently clarified *McCullock* by noting there may be cases where exclusion is required because "there is simply too great an analytical gap between the data and the opinion proffered," *see Ruggiero*, 424 F.3d at 255, courts in this district still routinely cite *McCullock* approvingly for the proposition that, in the specific circumstances of the case at hand, disputes about an expert's application of a differential diagnosis go to weight, not admissibility. *See, e.g., Ismael*, 2020 WL 4003291, at *17; *Monterey*, 2019 WL 5884466, at *6; *Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016).

### 4. Defendants' remaining arguments lack merit.

Paradoxically, despite complaining that Dr. Agharkar's report provides insufficient analysis to support his opinions, Defendants also seek to preclude him from discussing the factual basis for his opinions at trial. *See* DE-211 at 23–25. If the jury is going to fairly evaluate Dr. Agharkar's diagnosis, he must be able to present the basis for it which is—as is typical for a psychiatric report—derived from interviews of Mr. Rosario and his friends and family.

Nor does anything from attorney Carl Loewenson, Jr.'s deposition demonstrate that Dr. Agharkar's witness summaries are "unreliable." *See* DE-211 at 23. Mr. Loewenson expressly noted "I may have said that to the doctor" but that on reflection "as I sit here today" he was not sure Mr. Rosario's anxiety was worse after prison: "there's been plenty of anxiety in both contexts." Ex. 10, Deposition of Carl Loewenson, dated June 17, 2019, at 162:11–163:9. Notably, Mr. Loewenson only met Mr. Rosario after he had already been incarcerated for years; unlike other witnesses, he is not commenting on changes to Mr. Rosario before and after his wrongful conviction.

Finally, while Dr. Agharkar will only offer the opinions in his rebuttal report if Defendants' experts are permitted to testify, his rebuttal report provides a more than sufficient basis for him to explain why he disagrees with the diagnoses provided by Defendants' experts.

### III.    Conclusion

Defendants offer no basis to limit the proffered opinions from admittedly qualified experts Dr. Dysart and Dr. Agharkar, let alone to entirely preclude their testimony, as Defendants request. Their motion should be denied in its entirety.

Dated:  New York, New York
        March 22, 2021

                                    Respectfully submitted,

                                    **/s/ Emma Freudenberger**
                                    Nick Brustin
                                    Emma Freudenberger
                                    Anna Benvenutti Hoffmann
                                    Neufeld Scheck & Brustin, LLP
                                    99 Hudson Street, Eighth Floor
                                    New York, NY 10013
                                    (212) 965-9081
                                    nick@nsbcivilrights.com
                                    emma@nsbcivilrights.com
                                    anna@nsbcivilrights.com

                                    *Attorneys for Plaintiff Richard Rosario*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I delivered the foregoing *Memorandum in Opposition to Defendants'*

*Motion to Preclude the Expert Opinions of Jennifer Dysart, Ph.D. and Bhushan S. Agharkar,*

*M.D.* to all counsel of record by ECF on March 22, 2021.

Respectfully submitted,

**/s/ Kayla Jessup**
*Paralegal, Neufeld Scheck & Brustin, LLP*