**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

RICHARD ROSARIO,

               Plaintiff,

    -against-

THE CITY OF NEW YORK, *et al.*,

               Defendants.

18-cv-4023 (LGS)

## DECLARATION OF EMMA FREUDENBERGER

I, EMMA FREUDENBERGER, an attorney duly admitted to practice in the Southern District of New York, submit this declaration under penalty of perjury:

1.     I am partner at Neufeld Scheck & Brustin, LLP, ("NSB"), with offices at 99 Hudson Street, 8th Floor, New York, New York 10013, where I have worked since 2008.

2.     NSB has represented Plaintiff Richard Rosario since 2016 following the vacatur of his conviction based on a reinvestigation by the Bronx County District Attorney's Office that concluded he had not received a fair trial. In January 2018, NSB filed this 42 U.S.C. § 1983 wrongful conviction lawsuit on his behalf against the City of New York, along with various other individual defendants including New York City Police Detective Gary Whitaker. In August 2022, NSB obtained a jury verdict that Defendant Whitaker had maliciously prosecuted Mr. Rosario and denied him a fair trial, causing him to spend nearly 20 years imprisoned for murder he did not commit; the jury awarded Mr. Rosario $5 million in damages.

3.     I have been co-lead counsel on this case, with my partner Nick Brustin, since its inception.

1

4.      I make this declaration in support of an application for attorney's fees pursuant to 42 U.S.C. § 1988. I first summarize the work done, hours requested, and rates sought by the entire Plaintiff's team. I also describe in more detail my background and the hours I have expended on this matter. I am fully familiar with the facts discussed herein.

## OVERVIEW

### The litigation was exceptionally complicated.

5.      This case, of the many § 1983 wrongful conviction cases I litigated over my fourteen-plus years at NSB, stands out as one of the most complex and factually intricate.

6.      After the Bronx County District Attorney's Office reinvestigated Mr. Rosario's case and agreed that he should never have been convicted at trial, Mr. Rosario filed this § 1983 civil rights action against Defendants Whitaker, Martinez, and Cruger, the City of New York, and other individual defendants in 2018. The four years between the filing of the complaint and Plaintiff's successful verdict at trial were long and complicated.

7.      Discovery in this case was complicated from the start. The procedural history underlying the vacatur of Mr. Rosario's conviction was complex, including multiple CPL 440 motions on different theories, as well as a reinvestigation by the Bronx District Attorney's Office that uncovered additional new evidence relevant to Mr. Rosario's innocence. The post-conviction litigation generated a substantial number of documents that needed to be reviewed and understood to craft Plaintiff's primary legal claims and theories, which, unlike in some wrongful conviction cases, differed from the arguments that had been made in the 440 proceedings. That process was successful; Mr. Rosario prevailed at the motion to dismiss stage.

8.      The case also presented complicated discovery issues. To meet his burden, Plaintiff had to cross-examine and discredit two third-party witnesses who persisted in a

mistaken belief that their original identifications were accurate and that Mr. Rosario was the shooter. One was hostile and the other harbored resentment about having been featured on television; in other words, both were difficult witnesses outside Mr. Rosario's control.

9.     In addition, the parties had to take discovery from a number of other third-party witnesses whose locations were sometimes unknown and who were not under either side's control, many of whom did not testify in the underlying criminal trial, and some of whom were hostile.

10.     Ultimately, the parties took a combined 34 depositions, which included two-day depositions of Mr. Rosario, Defendants' expert DeAnsin Parker, and non-party witnesses, Michael Sanchez and former Defendant NYPD officer Irwin Silverman.

11.     Given the defense's strategy of arguing that Mr. Rosario was the shooter, Plaintiff had to depose Mr. Rosario's alibi witnesses in order to ensure that their testimony would be available at trial. Ultimately, because of the defense's positions that innocence was not relevant and therefore the depositions should not occur, and subsequently, that even witnesses outside the subpoena power had to be presented live at trial, those depositions also multiplied the briefing that occurred during discovery.

12.     Moreover, it was also necessary to take discovery into many issues related to the original police investigation (such as motive for the homicide), even though ultimately evidence regarding those issues was not presented at trial.

13.     For example, the parties received documents from the Bronx District Attorney's office late in discovery indicating that the victim had obtained a gun from his brother-in-law days before the shooting because he was so scared, in contrast to the prosecution's theory that the shooting was the result of a random street altercation. Although the Court ultimately

3

excluded evidence regarding Plaintiff's alternate theory of motive at trial, the Court agreed the matter was relevant to Plaintiff's proof, granting his application for three additional depositions based on the Bronx District Attorney's production. (Dkt. No. 98).

14.     Furthermore, over the life of the case, there were two rounds of briefing on dispositive motions—for judgment on the pleadings (Dkt. Nos. 63, 78, 80) and for summary judgment (Dkt. Nos. 166, 175, 181). Summary judgment, in particular, was a heavy lift requiring over 500 hours to put forth the affirmative evidence meeting Plaintiff's burden on 5 different claims. Plaintiff was ultimately successful, with all his key claims surviving both rounds of briefing. Even so, Defendants repeatedly continued to raise the same arguments, such as whether Mr. Rosario's innocence is relevant to his claims—an issue that Defendants brought to the forefront during the trial—which required many hours of briefing.

15.     To be sure, a successful verdict in this case was never guaranteed. Proof of Defendants' misconduct, and by extension, Mr. Rosario's innocence, relied on alibi witness accounts that contradicted eyewitnesses' identifications and police officer's accounts of those identifications. Over two-and-a-half decades after the 1996 murder that led to Mr. Rosario's wrongful conviction, the eyewitnesses—victims of Defendant officer's suggestive procedures—stood by their incorrect identifications.

16.     As a result, Plaintiff's counsel had the difficult task of convincing the jury that the science showed that eyewitnesses were wrong without attacking the eyewitnesses, who believed they had seen Mr. Rosario commit the murder. In order to accomplish this, counsel had to present to the jury expert testimony on counter-intuitive eyewitness identification science, a rapidly developing field that NSB is familiar with due to our specific expertise in wrongful conviction cases where eyewitness testimony has contributed to the underling conviction. Of

note, the City proffered an expert in eyewitness identifications, Laura Mickes, but elected not to

call her to testify after her 7-hour deposition.

17.     Furthermore, to succeed, Plaintiff had to not only demonstrate that the

eyewitnesses were mistaken but also meet the heavy burden of demonstrating intentional police

misconduct caused the wrongful conviction. To make out his claims of police misconduct around

the identifications, Plaintiff's counsel had to rely on our knowledge of the procedures in place in

the NYPD surrounding eyewitness identifications at the time in order to disprove the defense's

explanation for how they obtained the identifications implicating Mr. Rosario—the only

evidence that had ever implicated him in the crime. In other words, in order to prevail, Plaintiff

had to prove that what police said happened did not happen, despite Defendants' unsurprising

denials that they did anything wrong. This required knowledge and expertise regarding both

§ 1983 claims related to investigative misconduct and New York City Police Department

procedures concerning identification procedures. At each step of the litigation, Plaintiff's counsel

had to continuously rely on their expertise so that they could prove Defendant's misconduct and

Mr. Rosario's innocence.

18.     Moreover, as the Court is well-aware, Plaintiff has significant mental health

struggles that created additional complexity at every stage of the litigation. Winning Mr.

Rosario's case required not just the technical expertise but also an understanding of the

manifestations of complex PTSD directly derived from counsel's familiarity with the impact of

wrongful incarceration and its manifestations. Plaintiff's counsel had to continuously adapt and

strategize based on the sometimes-extreme fluctuations in Mr. Rosario's mental health. This

particularly added complications to aspects of the case in which Mr. Rosario had to be involved

or was implicated, such as his 50-h hearing, deposition, discovery into his electronic

communications, and depositions of his family members. Similarly, each time Mr. Rosario and his counsel had to prepare for trial, Mr. Rosario would experience mental health symptoms that made it increasingly difficult for him to trust anyone, including his family and his especially his legal team, complicating counsel's preparations and necessitating additional hours of work.

19.     In addition, preparing for and conducting a trial in the middle of the COVID-19 pandemic presented special challenges. For example, the trial was originally set for June 28, 2021, but was then adjourned to early January 2022; after substantial preparation was made for that trial date the trial was adjourned only a week before trial due to COVID; trial was then reset for late January 2022, only to be adjourned again at Defendants' last-minute request. (*see* Dkt. Nos. 195, 227, 228, 310, 314, 358). The Court eventually scheduled the trial for July 25, 2022. The changes in trial date meant that Plaintiff's counsel had to spend hundreds of hours preparing for trial multiple times. It also posed special difficulties for Plaintiff's work in other cases, which had to be repeatedly rescheduled or postponed to accommodate trial dates in this case which ultimately did not occur.

20.     While preparing for a trial and changing trial dates in the middle of the COVID-19 pandemic are challenging in any case, in this case they presented unique challenges. Many witnesses lived out of state and thus out of the Court's subpoena power which meant they had to appear voluntarily and be convinced to travel to New York City, each time—despite the inconvenience it caused them. Moreover, Defendants continually refused to accommodate alternatives to having live witnesses such as reading their deposition transcripts or having video testimony. Substantial time was spent addressing these issues with defense counsel and before the Court.

21.    As alluded to above, the litigation in this case involved multiple stages of dispositive motion practice—including on the first day of trial, on July 25, 2022, where Defendants sought to dismiss the case as a sanction for Plaintiff deleting text messages—and repeated briefing on a plethora of issues. Plaintiff was ultimately successful at each of these stages, culminating in the entry of the $5 million judgment in favor of Mr. Rosario. The verdict exceeded any settlement offer from Defendants over the course of the litigation.

**The total time NSB requests compensation for is reasonable.**

22.    NSB is seeking compensation on the merits for a total of 5,624.6 attorney hours plus 27.7 travel hours, and 2,011.0 paralegal and law clerk hours. NSB also seeks compensation for a total of 173.0 attorney hours, and 97.5 paralegal and law clerk hours for work on this fee application. Given the over six years of representation, this has been spread among 14 different attorneys, 6 paralegals, and 18 law clerks, and an additional lawyer and paralegal for fees on fees. These total numbers are exceedingly reasonable given the amount of litigation activity as well as Plaintiff's overall success in the lawsuit.

23.    In addition, from NSB's experience, the total number of hours in this case is relatively low, even taking into account that this is a case that went to trial. The number of total hours NSB is requesting compensation for, in juxtaposition with the incredible volume of litigation, demonstrate that NSB's prosecution of this case was efficient. In addition, NSB has a special expertise in § 1983 wrongful conviction suits like this one, which permitted us to litigate far more effectively and efficiently than most other lawyers would have been able to.

24.    Over the past 20 years, NSB has successfully litigated dozens of wrongful conviction § 1983 suits across the county, and has obtained some of the leading trial and appellate decisions in this evolving area of law. *See, e.g., Roberts v. City of Fairbanks*, 947 F.3d

1191 (9th Cir. 2020); *Fogle v. Sokol*, 957 F.3d 148 (3d Cir. 2020); *Mellen v. Winn*, 900 F.3d

1085 (9th Cir. 2018); *Restivo v. Hessemann*, 846 F.3d 547  (2d Cir. 2017); *Halsey v. Pfeiffer*, 750

F.3d 273 (3rd Cir. 2014); *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006);

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005).

25. NSB has successfully represented over a dozen exonerees in § 1983 wrongful

conviction suits against New York City alone, making us particularly familiar with the legal

landscape here. *See, e.g. Fernandez v. City of New York*, No. 1:20-cv-10498 (S.D.N.Y.) ($12

million settlement in § 1983 wrongful suit); *Ruiz v. City of New York* (S.D.N.Y.) ($8.99 million

prefiling settlement in § 1983 wrongful conviction suit); *Weeks v. City of New York*, NYC

Comptroller Claim No. 2019P1035602 (E.D.N.Y.) ($8.3 million in § 1983 wrongful conviction

suit); *Denny v. City of New York*, Comptroller Claim Nos. 2018P1007300 and 2018P1007309

($9.75 million prefiling settlement in § 1983 wrongful conviction suit); *Counts v. City of New

York,* NYC Comptroller Claim No. 2018P1023022 ($8.246 million prefiling settlement in § 1983

wrongful conviction suit); *Jones v. City of New York*, No. 18-cv-834 (S.D.N.Y.) ($7.5 million

settlement in wrongful conviction suit); *Hatchett v. City of New York*, No. 17-cv-1324

(E.D.N.Y.) ($12.25 million settlement in § 1983 wrongful conviction suit); *Connor v. City of

New York*, No. 1:15-cv-07079 (E.D.N.Y.) ($7.95 million settlement in § 1983 wrongful

conviction suit); *Wilson v. City of New York*, No. 15-cv-4156 (E.D.N.Y.) ($13 million settlement

in § 1983 wrongful conviction suit); *Garcia v. City of New York,* No. 08-CV-04274 (S.D.N.Y.)

and *Morillo v. City of New York* (separate $7.5 million settlements for § 1983 wrongful

conviction plaintiffs); *Gibbs v. City of New York, et al.,* No. 06-CV-5112 (E.D.N.Y.) ($9.9

million settlement in § 1983 wrongful conviction suit); *Gonzalez v. City of New York*, No.

26771/03 (Kings Cty Sup. Ct.) ($3.4 million settlement in § 1983 wrongful conviction suit).

**Attorney, Paralegal and Law Clerk Rates**

26.     The specific attorneys for which NSB seeks compensation, as well as the

requested rates for each, are listed below.

| Name of Counsel | Role | Hourly Rate |
|---|---|---|
| Nick Brustin | Partner | $900 |
| Anna Benvenutti Hoffmann | Partner | $800 |
| Emma Freudenberger | Partner | $800 |
| Amelia Green | Partner | $500 |
| Len Kamdang | Senior Associate | $450 |
| Richard Sawyer | Senior Associate | $450 |
| Sona Shah | Senior Associate | $450 |
| Bettina Roberts | Senior Associate | $425 |
| Christina Matthias | Senior Associate | $425 |
| Katie McCarthy | Senior Associate | $425 |
| Avinash Samarth | Associate | $400 |
| Katie Haas | Associate | $400 |
| Kate Fetrow | Associate | $375 |
| Gerardo Romo | Associate | $350 |
| Rhianna Rey | Associate | $325 |
|  | Paralegals/ Law Clerks | $200 |

27.     As described in the supporting affidavits from established practitioners Andrew

Celli, Carl H. Loewenson, Jr. and Rachel Skaistis (*see* Exhibits 1, 2, 3) together with the

supporting affidavits from each attorney,[1] these requested rates are reasonable in light of the

relevant markets, as well as the reputation, experience and skill of the NSB attorneys.

**NSB took on considerable risk in litigating this case.**

28.     There is a substantial risk that a § 1983 wrongful conviction suit will not succeed.

Many such suits are dismissed at the pleadings stage, *see, e.g., Vasquez v. City of New York*, No.

---

[1]     Declarations from each attorney that worked on this case (with the exception of Nick Brustin, who is submitting a Declaration filed separately) are attached as Exhibits 4-16. The time detail for the specific paralegals and law clerks that worked on the case is attached as Exhibit 17.

14 Civ. 491(RMB), 2014 WL 5810111 (S.D.N.Y. Nov. 6, 2014) (dismissing all § 1983 claims

brought by man who spent 15 years imprisoned before his conviction was vacated); or at

summary judgment, *see, e.g., Jovanovic v. City of New York*, No. 04 Civ. 8437(PAC), 2010 WL

8500283 (S.D.N.Y. Sept. 28, 2010) (granting summary judgment for police defendants on all §

1983 claims brought by plaintiff who spent 5 years wrongly imprisoned for rape), *aff'd* 486 Fed.

App'x 149 (2d Cir. June 20, 2012); more lose at trial, *see, e.g., Evans v. City of Chicago*, 513

F.3d 735 (7th Cir. 2008) (affirming defense verdict in § 1983 suit by plaintiff who spent 30 years

wrongly imprisoned before he received an innocence-based pardon); or prevail on liability but

receive plainly insufficient damages, *see, e.g., Parish v. City of Elkhart*, 702 F.3d 997 (7th Cir.

2012) (noting § 1983 plaintiff who spent 8 years wrongly imprisoned was awarded

"unfathomably-low damages" of $78,000); or lose on appeal, *see, e.g., Connick v. Thompson*,

131 S. Ct. 1350 (2011) (vacating $14 million jury verdict for § 1983 plaintiff who had spent 18

years wrongly imprisoned, holding there was insufficient proof of liability, and entering

judgment for defendants).

29.     The risks inherent in a § 1983 wrongful conviction suit were particularly acute in

this case, where Defendants fought vigorously at every stage and insisted on Plaintiff's guilt,

even at trial, despite the vacatur of his conviction. Even throughout the trial, two witnesses

continued to insist that Mr. Rosario was the true perpetrator of the homicide for which he was

wrongly convicted.

30.     Further adding to the risk that NSB took on, this case hinged on an analysis of a

complex area of science, the reliability of eyewitness identification.

31.     The importance of the interests at issue, as well as the extent of the damages

incurred, made it that much more important that Mr. Rosario have experienced, skilled counsel

representing him. In short, with so much at stake, a reasonable paying client would insist on

having lawyers he could feel confident were up to the task.

### NSB's skill and experience justify its fee request.

32.　　NSB has earned a national reputation as one of the premier civil rights litigation

boutiques in the country. It has been named by National Law Journal as one of America's top 50

"Elite Trial" firms. NSB has also been recognized by *Benchmark Plaintiff* as one of the top four

civil rights firms in the country. *Benchmark Plaintiff* additionally recognized NSB partners Peter

Neufeld, Barry Scheck and Nick Brustin as "litigation stars." For each of the last eight years, all

the then-current partners at NSB were named as SuperLawyers. I was recognized as a "Rising

Star" from 2013-2019, my partner Anna Benvenutti Hoffman was recognized as a "Risking Star"

from 2014-2018, and junior partner Amelia Green was recognized as a "Rising Star" for the last

three consecutive years, since 2020.

33.　　NSB's numerous successes at trial are a testament to the quality of its

representation, including in the Southern and Eastern Districts of New York. *See Restivo v.*

*Hessemann*, 846 F.3d 547 (2d Cir. 2017) (affirming award of $36 million to plaintiffs in

fabrication of evidence case); *Deskovic v. City of Peekskill, et al.,* No. 07-CV-8150 (S.D.N.Y.)

($41.65 million jury verdict for plaintiff wrongly imprisoned for 16 years—from age 16 until he

was 32—for a rape and murder he did not commit).

34.　　NSB's other notable nationwide successes at trial include: *Trulove v. D'Amico*,

No. 16-cv-00050 (N.D. Cal.) (jury awarded $10 million in damages to plaintiff who spent six

years in prison after being wrongfully convicted of murder.); *Gates v. District of Columbia*, No.

1:11-cv-00040 (D.D.C.) (jury found that District of Columbia police officers had fabricated

evidence and hid exculpatory evidence during plaintiff's trial for rape and murder, resulting in

11

28-year wrongful conviction, with the government settling claims for $16.65 million while jury was deliberating on damages); *Howard v. City of Durham*, No. 1:17-cv-00477 (M.D.N.C.) (jury awarded $6 million to plaintiff after he spent decades in prison for two murders he did not commit); *Rodriguez v. City of Houston*, No. 4:06-cv-02650 (S.D. Tex.) (jury awarded $5 million to plaintiff who spent 17 years wrongly imprisoned for rape, finding the City of Houston responsible under for fabrication of evidence as part of a persistent, widespread pattern of forensic misconduct); *Mann v. Walder, et al.*, No. BER-L-283-07 (N.J. Super. Ct. Law Div.) ($2,272,274 jury award—the first ever in New Jersey for § 1983 loss-of-life damages—for family of an unarmed Native American man who was shot and killed by a New Jersey State Park Police officer); and *Mayes v. City of Hammond*, No. 03 Civ. 379, (N.D. Ind.) ($9 million jury verdict for plaintiff, who spent 19 years in prison for a rape he did not commit).

35.    NSB has rarely had to litigate fee awards, as we have often been able to settle our cases before this point in the litigation, or reach a settlement on the reasonable fees incurred. For example, as described above, *see supra* ¶ 25, NSB has settled a number of wrongful conviction cases against the City of New York.

36.    NSB is similarly successful outside of New York City. Indeed, the firm has a long history of success in reaching record wrongful conviction settlements around the country. *See, e.g., Bryant v. Baltimore Police Department*, No. 1:19-cv-00384 (D. Md.) ($8 million settlement for plaintiff who spent 17 years wrongfully incarcerated before DNA exoneration as a result of police's suppression of exculpatory evidence); *Deskovic v. City of Peekskill, et al.*, No. 07-CV-8150 (S.D.N.Y.) (over $23 million in total settlements for wrongful conviction suit); *Coley v. Simi Valley* (C.D. Cal.) ($21 million settlement for wrongfully convicted plaintiff who served 39 years in prison for murders of a woman and her 4-year-old son); *Tapp v. City of Idaho Falls*, No.

4:20-cv-00476 (D. Idaho) ($11.7 million settlement in § 1983 wrongful conviction suit); *Berry v. Las Vegas Metro. Police Dep't*, 19-cv-640 (D. Nev.) ($14.5 million settlement in § 1983 wrongful conviction suit); *Saunders v. City of Chicago*, 12-cv-09158 (N.D. Ill.) ($15.99 million total settlements for § 1983 wrongful conviction suit); *McIntyre v. Unified Government*, No. 18-cv-2545 (D. Kan.) ($12.5 million settlement in § 1983 wrongful conviction suit); *Wright v. City of Philadelphia*, No. 16-cv-5020 (E.D. Pa.) ($9.8 million settlement in § 1983 wrongful conviction suit); *Gonzalez v. City of Waukegan*, No. 16-2906 (N.D. Ill.) ($9.5 million settlement in § 1983 wrongful conviction suit); *Lewis v. City of New Haven*, No. 3:16-cv-1382 (D. Conn.) ($9.5 million settlement in § 1983 wrongful conviction suit); *Courtney v. City of Tulsa*, No. 14-CV-308 (N.D. Okla.) ($8 million settlement in § 1983 wrongful conviction suit); *Allen v. City of St. Louis,* No. 14-CV-01398 (E.D. Mo.) ($14 million settlement in § 1983 wrongful conviction suit); *Tankleff v. County of Suffolk*, No. 09-cv-1207 (E.D.N.Y.) ($10 million from Suffolk County, NY, after spending 18 years wrongly incarcerated for the murders of his parents after evidence surfaced of perjury by the lead detective); *Barr v. Kachiroubas* , No. 1:12-cv-08327 (N.D. Ill.) ($10 million settlement in § 1983 wrongful conviction suit).

37.     When NSB has litigated fees, we have consistently been awarded rates at the very top of the relevant market. For example, seven years ago, in another § 1983 wrongful conviction suit litigated by NSB, the court found that due to NSB's "particular expertise litigating § 1983 wrongful conviction suits" and that it had "successfully litigated dozens of such cases around the country" it was entitled to the rates requested, up to $700 for senior partners, even though at the time that exceeded the highest prior hourly rate award in the Southern District. *See Restivo*, 2015 WL 7734100 at *3.

13

38.     I am familiar with the general market rates in the Southern District of New York,

from my personal interactions with lawyers at firms of similar reputation and skill, and from

reviewing fee awards in other complex civil litigation. The Southern District rates requested for

the NSB attorneys are below market rates for lawyers of comparable skill, reputation, and

experience.

39.     For example, Andrew G. Celli, Jr. is a founding partner of Emery Celli

Brinckerhoff Abady Ward & Maazel, LLP, a firm that practices both civil rights and commercial

litigation, and therefore is paid both by contingency fee and on an hourly basis. Celli Decl. ¶ 6.

He and his firm have worked with NSB on many occasions in the past. *Id.* ¶ 7. He characterizes

NSB attorneys as "among the finest litigators he ever met" and states that "there is not a superior

group of civil rights and constitutional litigators in the private bar in New York City." *Id.* ¶ 8.

Mr. Celli's firm often calls upon NSB to consult on particularly complex cases. *Id.* ¶ 9. Mr. Celli

states that the rates sought by NSB attorneys here are reasonable and "substantially *lower* than

the prevailing rates at the major Southern District of New York law firms for lawyers of

comparable skill and experience." Celli Decl. ¶ 12. Billing rates at Mr. Celli's firm are

essentially identical to the rates that NSB requests here, with senior partners billing at $900-950

per hour, Mr. Celli himself billing at $825 per hour, junior partners billing at $550-650 per hour,

and associates billing between $450 and $500 per hour. *Id.*

40.     In addition, Carl H. Loewenson, Jr., an attorney with almost forty years of

experience who has known and represented Mr. Rosario since 2004, after meeting with and

evaluating potential counsel recommended that Mr. Rosario choose NSB to represent him in this

action. Loewenson Decl. ¶ 7. Mr. Loewenson confirms that the quality of NSB's work is equal to

that of his colleagues at Morrison Foerster, and that the legal and factual issues NSB deals with

are as complex as those that arise in his own practice. *Id.* ¶ 8. Mr. Loewenson, whose own standard hourly rate is $1,650 per hour, also supports NSB's rates as "quite low compared to the rates at the major Southern District of New York law firms for lawyers of comparable skill and experience in federal litigation." *Id.* ¶ 11. He also states that his firm charges rates that are "consistent with [its] understanding of the market" and "far higher" than the request made here, with rates of $405 for new associates and up to $1,825 for certain partners. *Id.*

41.     Rachel Skaistis, a partner at Cravath, Swaine & Moore LLP who has previously worked with NSB partners assigned to this case (Skaistis Decl. ¶ 1), similarly supports NSB's rates as "very reasonable in the Southern District of New York market for a complex case like the Rosario litigation, particularly given the experience and skill of NSB's attorneys." *Id.* ¶ 8. Ms. Skaistis goes on to state that NSB's rates "are lower, and in some cases substantially lower, than the prevailing rates at major Southern District of New York law firms for lawyers of comparable skill and experience…" *Id.* ¶ 9. Ms. Skaistis also confirms that NSB attorneys are "highly-skilled litigators" and she has recommended NSB's retention to prosecute civil rights claims. *Id.* ¶ 5. She recognizes that NSB's practice is complex like her own federal practice, and that expertise in the area is "critically important" to success.

### The hours expended by each lawyer were reasonable.

42.     Throughout the life of the case, we have used our judgment—developed through our work on dozens of successful § 1983 wrongful conviction suits—to staff the case as efficiently as possible. NSB made substantial use of the junior attorneys and paralegals, relying on the most senior lawyers only where in our judgment it was critical to do so.

43.     Where possible, we assigned work to junior staff members—either junior attorneys or paralegals—whose work is billed at a lower rate. At times, it is either necessary or

more efficient for one of the partners to do work. For example, while some deposition preparation may be delegated to a junior attorney or even paralegal, much of it may not, because the lawyer taking the deposition must be intimately familiar with the underlying documents.

44.     The vast majority of NSB's cases settle for a global figure that includes attorney's fees; it is only the rare case in which we ever make a fee application to a court. At the same time, we maintain a full docket of approximately 30 other complex civil rights cases at any given time, with a roster of only 14 attorneys (6 partners and 8 associates) for all of those cases. As a result, all of our attorneys are kept busy with their caseloads, and have no incentive to spend any more time on their tasks than we judge necessary to the successful prosecution of this case. To the contrary, we have a strong incentive to work as efficiently as we can, while maintaining the quality of our representation to maximize our client's chance of success.

45.     The total number of hours in this case is exceedingly reasonable given the scope of this litigation to date. This case took a long path to the ultimate successful conclusion, encompassing representation spanning six years and over 500 docket entries: a complicated underlying procedural history surrounding the vacatur of Mr. Rosario's conviction that had to be understood to craft legal claims and theories; a series of discovery issues related to the original police investigation; hostile and hard-to-locate third-party witnesses; 34 depositions, including multiple two-day depositions; successive rounds of briefing on dispositive motions; multiple last-minute adjournments of trial due to the COVID-19 pandemic and Defendants' eleventh-hour requests for adjournment; and ultimately a 3-week trial including the presentation of 20 witnesses.

46.     Defendants' vigorous opposition at each stage of the litigation increased the time Plaintiff's counsel spent. For example, Defendants both moved to dismiss all claims and then

moved for summary judgment on all claims; Defendants also moved to preclude both of Plaintiff's testifying experts. Although these motions were ultimately unsuccessful, they necessitated substantial time by Plaintiff's counsel. Similarly, Defendants categorically refused to stipulate to anything in advance of or during trial.

47.     The reasonableness of the staffing by NSB is demonstrated by the rough equivalence to staffing on the defense team. Throughout discovery, day-to-day case management was primarily handled by an NSB associate, supervised at various times by a senior associate or partner who took many of the depositions.

48.     Similarly, throughout discovery Defendants had a Senior Counsel managing most day-to-day tasks, assisted by another attorney and supervised by a senior attorney. Both sides ramped up staffing during the run up to and during trial; Defendants had four attorneys participating at trial and at least one supervising attorney in court at all times in addition.

49.     Even though Plaintiff had the burden of proof and presented nearly all evidence, the trial staffing was similar: four partners, two associates and one paralegal. Moreover, NSB's expertise in § 1983 wrongful conviction suits like this one made its work much more efficient and effective.

50.     Plaintiff is also requesting compensation for time spent on the few motions and issues on which he did not prevail because the suit as a whole involved common facts and related legal theories. Here, all claims and discovery were directly related to the NYPD investigation that caused Mr. Rosario's wrongful conviction, as well as to Plaintiff's innocence, which was directly relevant to both liability and damages.

51.     As demonstrated by the declarations filed with this motion, all of the hours requested are carefully documented in detailed contemporaneous time records. The attorneys

17

seek compensation only for time reasonably expended, and have exercised billing judgment, discounting or excluding time where appropriate.

52.     As another indication of the overall reasonableness of the fee request here, it is less than what NSB has sought (and received) in other similar § 1983 suits. For example, in 2018, another district court ordered a stipulated fee award in a § 1983 wrongful conviction suit of $4.5 million, based on requested rates of $800 per hour for Mr. Brustin, $650 per hour for Ms. Hoffmann, and $400 for senior associates. *Trulove*, No. 16-cv-00050.

53.     Similarly, the *Restivo* award of $4,677,897.50 in fees and $320,017.05 in costs is substantially more than what is sought here—even though that is based on rates and costs from 8 years ago. *Restivo*, 2015 WL 7734100, at *6.

54.     In addition, in 2009, the District Court for the Southern District of Texas, awarded a total of nearly $3.5 million in fees and expenses for another § 1983 wrongful conviction suit. *See Rodriguez v. City of Houston*, 06-CV-02650 (S.D. Tex. Dec. 22, 2009).  Even though that award was made 13 years ago (based on hourly rates of $535 for senior partners and $275 for associates), the total award is only slightly less than the request here.

### Paralegal and Law Clerk Hours

55.     Our paralegals are all accomplished recent college graduates. The paralegals who worked on this case include:

- Camilo Duran, an honors graduate from the University of Pennsylvania
- Moises Soto-Brito, an honors graduate from Franklin & Marshall College
- Alison Fraerman, an honors graduate from Barnard College who went on to Yale Law School
- Mary Felder, an honors graduate from Northwestern University who went on to Penn Law School
- Susan Kuralt-Smith, a paralegal with over 15 years of experience, who is an honors graduate from Washington University in St. Louis
- Kayla Jessup, an honors graduate from University of Chicago

56.     Our law clerks are all law students attending the top law schools in the country, including Columbia Law School and Fordham Law School. They generally go on to work at prestigious public interest organizations.

57.     I was involved in supervising the paralegals and law clerks.

58.     The work we seek compensation for does not consist of typical paralegal-level assignments, but instead more substantive assignments, such as reviewing files to compile timelines and reviewing testimony to help prepare for depositions and support the opposition to the motion for summary judgment. By assigning such substantive work to paralegals, we minimized the time expended by junior attorneys.

**Hours and rates sought**

59.     In total, we request the following sums (not including travel time and fees on fees):

**SUBSTANTIVE WORK**

| Name of Counsel | Hourly Rate | Hours | Total |
|---|---|---|---|
| Nick Brustin | $900 | 1010.0 | $909,000.00 |
| Anna Benvenutti Hoffmann | $800 | 739.9 | $591,920.00 |
| Emma Freudenberger | $800 | 759.3 | $607,440.00 |
| Amelia Green | $500 | 182.6 | $91,300.00 |
| Len Kamdang | $450 | 271.0 | $121,950.00 |
| Richard Sawyer | $450 | 1250.3 | $562,635.00 |
| Bettina Roberts | $425 | 116.7 | $49,597.50 |
| Christina Matthias | $425 | 39.2 | $16,660.00 |
| Katie McCarthy | $425 | 18.4 | $7,820.00 |
| Avinash Samarth | $400 | 143.4 | $57,360.00 |
| Katie Haas | $400 | 663.4 | $265,360.00 |
| Kate Fetrow | $375 | 24.9 | $9,337.50 |
| Gerardo Romo | $350 | 381.3 | $134,455.00 |
| Rhianna Rey | $325 | 24.2 | $7,865.00 |
| Paralegals/law clerks | $200 | 2011.0 | $402,200.00 |
| **TOTAL** | | **7635.6** | **$3,833,900.00** |

60.     For travel time, we request the following sums, at 50% of our rate for substantive work:

**TRAVEL TIME**

| Name of Counsel | Hourly Rate | Hours | Total |
|---|---|---|---|
| Nick Brustin | $450 | 1.5 | $675.00 |
| Len Kamdang | $225 | 10.0 | $2.250.00 |
| Richard Sawyer | $225 | 16.2 | $3,645.00 |
| **TOTAL** | | **27.7** | **$6,570.00** |

61.     We request the following sums for the time spent preparing the fee petition:

**FEE PETITION**

| Name of Counsel | Hourly Rate | Hours | Total |
|---|---|---|---|
| Nick Brustin | $900 | 12.3 | $11,070.00 |
| Anna Benvenutti Hoffmann | $800 | 45.7 | $36,560.00 |
| Emma Freudenberger | $800 | 5.2 | $4,160.00 |
| Sona R. Shah | $450 | 55.2 | $24,840.00 |
| Gerardo Romo | $350 | 54.6 | $19,110.00 |
| Paralegals/law clerks | $200 | 97.5 | $19,500.00 |
| **TOTAL** | | **270.5** | **$115,240.00** |

**MY EDUCATION AND EXPERIENCE**

62.     In 2007, I graduated from Columbia University School of Law. I then served as a law clerk to the Honorable Virginia A. Long of the Supreme Court of New Jersey from 2007-2008.

63.     During the summer of 2006, I worked as an associate at NSB. Upon finishing my clerkship in September 2008, I returned to NSB, where I have worked ever since.  In addition to my practice I have lectured on litigating civil wrongful conviction cases at law schools including

Yale Law School, Columbia Law School, and Cardozo School of Law. My resume is attached as Exhibit 18.

64.     During my 14 years at NSB, I have worked almost exclusively on 42 U.S.C. § 1983 civil rights litigation in federal courts around the country. My practice focuses specifically on wrongful conviction and malicious prosecution cases like Richard Rosario's: lawsuits against police, prosecutors and/or state and municipal crime lab employees for fabricating evidence, withholding exculpatory evidence, and the like. This relatively new and constantly evolving body of law—arising at the intersection of criminal procedure and civil rights—consists of constitutional claims with very high burdens of proof, as well as complex immunity doctrines. To my knowledge, NSB is the only firm in the nation litigating these issues full-time.

65.     All of these cases involve potential defenses of absolute and qualified immunity, and most require a nuanced understanding of the differences between what it takes to vacate a criminal conviction and what it takes to prove civil liability. Fourteen years of experience with these issues, along with my access to NSB's collective knowledge, made my work on this case much more efficient than it otherwise would have been.

66.     In addition to the Southern, Eastern, and Western Districts of New York, I have litigated wrongful conviction cases in federal and state trial and appellate courts throughout the country, including in Alaska, Connecticut, Kansas, Louisiana, Massachusetts, Michigan, Missouri, Nevada, New Jersey, North Carolina, Oklahoma, Pennsylvania, and Texas.

67.     During my tenure at NSB, I have helped achieve trial and appellate victories, as well as substantial settlements, in approximately thirty other wrongful conviction cases. Other notable victories in addition to this case include *Deskovic v. Peekskill,* No. 07-CV-8150

(S.D.N.Y. 2014) ($41.65 million jury verdict in § 1983 wrongful conviction suit); *Sanford v. City of Detroit*, No. 17-cv-13062 (E.D. Mich.) ($7.5 million settlement for plaintiff who spent 8 years in prison for quadruple murder, resulting from police's fabrications of evidence); *DiPippo v. County of Putnam*, No. 17 Civ. 7948 (S.D.N.Y.) ($12 million settlement for plaintiff who spent 19 years in prison for rape and murder due to fabrications of evidence and *Brady* violations); and *Halsey v. Pfeiffer*, 750 F.3d 273 (3rd Cir. 2014) (settlement of $12.5 million after a Third Circuit decisions permitting wrongly convicted plaintiff to proceed to trial on § 1983 claims based on fabrication of evidence, malicious prosecution, and coercion).

## MY WORK IN THIS CASE

68.     I am seeking compensation for the time I spent on this matter from October 2016 until the present, including time spent on this fee petition.

69.     My role in the case since 2016 has been as co-lead counsel, with my partner Nick Brustin. I supervised the case on a day-to-day basis, supervising all aspects of its prosecution through trial.

70.     Specifically, over the six-plus years of my involvement with the case, I was involved in discovery and overall case strategy, including drafting and supervising discovery requests and responses, research and briefing on motions to compel, preparing for supervising, and defending depositions, and working with experts.

71.     I have also had substantial involvement in the many other rounds of briefing in this case, including the City of New York's Motion to Dismiss, discovery motions, the *Daubert* briefing on the admissibility of the expert testimony, and motions *in limine* in advance of the trial.

72.     As co-lead trial counsel, I was involved in all phases of the ten-day trial,
beginning with strategy decisions and all phases of preparation for the trial. I participated in jury
selection, prepared and presented the opening argument, conducted arguments during trial, was
the point of contact for many of our third-party witnesses, prepared witnesses, including
witnesses examined by other attorneys on the team, and supervised our case team—including
two associates, two interns, and paralegals—during trial. I also personally examined six
witnesses, including our liability expert on eyewitness identifications.

73.     As set forth in the billing records attached as Exhibit 19, which come from
contemporaneously kept timekeeping logs, I am seeking compensation for a total of 759.3
attorney hours in this matter, excluding work on this fee application.

74.     I have reviewed the attached billing record in its entirety, and made an effort to
take a conservative and reasonable approach to the total hours for which I seek compensation. In
my judgment, each hour set forth in Exhibit 19, Chart 1 was necessitated by the circumstances
and reasonably expended in pursuit of the ultimate favorable outcome in this complicated and
important civil rights case.

## WORK ON THE FEE APPLICATION

75.     I am also seeking compensation for the time I spent on the § 1988 fee application
in this case.

76.     As co-lead counsel, and along with my partners Nick Brustin and Anna
Benvenutti Hoffmann, my role on the fee application was to provide strategic guidance, to assist
in coordinating the collection of a complete set of attorney declarations, and to review the
briefing.

77.     As set forth in the billing records attached as Exhibit 19, Chart 2, which come from contemporaneously kept timekeeping logs, I am seeking compensation for a total of 5.2 hours for working on this fee application.

78.     I have reviewed the attached billing record in its entirety, and made an effort to take a conservative and reasonable approach to the total hours for which I seek compensation. In my judgment, each hour set forth in Exhibit 19, Chart 2 was necessitated by the circumstances and reasonably expended in pursuit of the ultimate favorable outcome in this complicated and important civil rights case.

I hereby declare under penalty of perjury that the foregoing is true.


Date:   October 7, 2022
        New York, NY

Emma Freudenberger