UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD ROSARIO,<br><br>    Plaintiff,<br><br>-against-<br><br>THE CITY OF NEW YORK, *et al.*,<br><br>    Defendants. | 18-cv-4023 (LGS) |

## DECLARATION OF NICK J. BRUSTIN

I, NICK J. BRUSTIN, an attorney duly admitted to the Southern District of New York, declare under penalty of perjury:

1. I am a partner of the firm Neufeld Scheck & Brustin, LLP ("NSB")[1] with offices at 99 Hudson Street, 8th Floor, New York, New York 10013.

2. NSB has represented Plaintiff Richard Rosario since 2016 following the vacatur of his conviction based on a reinvestigation by the Bronx County District Attorney's Office that concluded he had not received a fair trial. In January 2018, NSB filed this 42 U.S.C. § 1983 wrongful conviction lawsuit on his behalf against the City of New York, along with various other individual defendants including New York City Police Detective Gary Whitaker. In August 2022, NSB obtained a jury verdict that Defendant Whitaker had maliciously prosecuted Mr.

---

[1] Formerly Cochran Neufeld & Scheck, LLP.

Rosario and denied him a fair trial, causing him to spend nearly 20 years imprisoned for murder he did not commit; the jury awarded Mr. Rosario $5 million in damages.

3.  I have been co-lead counsel on this case, with my partner Emma Freudenberger, since its inception.

4.  I make this declaration in support of an application for attorney's fees pursuant to 42 U.S.C. § 1988, covering the hours I have expended on this matter, as well as the compensable costs incurred by NSB. I am fully familiar with the facts discussed herein.

## EDUCATION AND EXPERIENCE

5.  I graduated with a B.A from Brown University in 1988, received a master's degree in Educational Administration and Social Policy from the Harvard Graduate School of Education in 1991, and received my J.D. degree from Fordham University School of Law in 1995. Since graduating from law school, I have focused almost exclusively on civil rights litigation. I served as an Honors Program Trial Attorney with the Civil Rights Division of the U.S. Department of Justice from 1995 to 1997. As a DOJ trial attorney, I worked on a variety of complex civil rights cases including *United States v. Mellete*, a case that resulted in a comprehensive consent decree designed to facilitate the integration of women at The Citadel, as well as a number of continuing school desegregation cases in Mississippi, South Carolina, and Georgia. I received an Outstanding Performance Award in 1997.

6.  After leaving the Department of Justice, I worked from 1997 to 1999 at Beldock Levine & Hoffman, LLP in New York, as an associate, where the majority of my practice was devoted to civil rights and employment litigation. From 1998 to 1999, I was an adjunct professor

2

of law at Fordham University School of Law, where I taught litigation skills. I have also lectured on civil rights issues, including appearances at the annual NAACP Legal Defense and Education Fund Civil Rights Conference and various civil rights continuing education seminars around the country.

7. In 1999, I joined the boutique civil rights firm of Cochran Neufeld & Scheck, LLP ("CNS"). I worked at CNS as an associate until 2003, when I became a partner. In 2009 I became a named partner and our firm became Neufeld Scheck & Brustin, LLP ("NSB").

8. In 2011, I was selected as a Wasserstein Public Interest Fellow at Harvard Law School. My resume is attached as Exhibit A.

9. In the last two decades, I have litigated over 50 42 U.S.C. § 1983 wrongful conviction cases, upon information and belief, as many as any other attorney in the country. On information and belief, I have tried more wrongful conviction cases than any other attorney in New York City. In the last 15 years I have only lost one jury trial.

10. This body of law, arising at the intersection of criminal procedure and civil rights, is relatively new and swiftly evolving. These cases involve individual defenses of absolute and qualified immunity and require a nuanced understanding of the differences between what it takes to vacate a criminal conviction and the elements of civil liability, as well as the complexities of proving that an underlying constitutional violation was part of a municipal custom or policy that policymakers were on notice of, but deliberately indifferent to, in order to prevail.

11. To my knowledge, NSB is the only firm in the nation litigating these issues full-time. My concentration on these issues over the last several years, as well as the years my

partners Peter Neufeld, Barry Scheck, Anna Benvenutti Hoffmann, Emma Freudenberger, and Amelia Green, have spent litigating these cases at NSB, made our work on Mr. Rosario's case much more efficient than it otherwise would have been. Indeed, the collective expertise NSB possesses around the issues implicated in § 1983 wrongful conviction lawsuits enables our firm to litigate far more effectively and efficiently than would otherwise be possible.

12. I have also litigated wrongful conviction and other serious police misconduct cases in federal courts around the country, including in Alaska, Arizona, California, the District of Columbia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Montana, New Jersey, North Carolina, Ohio, Oklahoma, Rhode Island, Tennessee, and Texas.

13. In addition to my trial experience, I also have taken hundreds of depositions in wrongful conviction cases throughout the country, including numerous depositions of police officers and third-party witnesses. Testimony from depositions I have taken is often instrumental in settling cases or achieving success at trial.

14. During my tenure at NSB, I have actively litigated numerous wrongful conviction cases that have been resolved successfully, notably including the following trial victories in the Southern and Eastern Districts of New York: *Restivo v. County of Nassau*, No. 06-cv-6720 (E.D.N.Y.) (lead counsel at trial where jury awarded $36 million to plaintiffs in fabrication of evidence case) and *Deskovic v. City of Peekskill, et al.,* No. 07-CV-8150 (S.D.N.Y.) (lead counsel at trial, securing a $41.65 million jury verdict for plaintiff wrongly imprisoned for 16 years—from age 16 until he was 32—for a rape and murder he did not commit).

4

15. Other examples of successes at trial include: *Trulove v. D'Amico*, No. 16-cv-00050 (N.D. Cal.) (lead counsel at trial, where jury awarded $10 million in damages to plaintiff who spent six years in prison after being wrongfully convicted of murder); *Gates v. District of Columbia*, No. 1:11-cv-00040 (D.D.C.) (co-lead counsel at trial, where jury found that District of Columbia police officers had fabricated evidence and hid exculpatory evidence during plaintiff's trial for rape and murder, resulting in 28-year wrongful conviction, with the government subsequently settling claims for $16.65 million); *Howard v. City of Durham*, No. 1:17-cv-00477 (M.D.N.C.) (lead counsel at trial where jury awarded $6 million to plaintiff after he spent decades in prison for two murders he did not commit); *Mann v. Walder, et al.,* No. BER-L-283-07 (N.J. Super. Ct. Law Div.) (lead counsel at trial, securing a $2,272,274 jury award—first ever in New Jersey for §1983 loss-of-life damages—for family of an unarmed Native American man who was shot and killed by a New Jersey State Park Police officer); and *Mayes v. City of Hammond*, No. 03 Civ. 379, (N.D. Ind.) (lead counsel at trial, securing a $9 million jury verdict for plaintiff, who spent 19 years in prison for a rape he did not commit).

16. I have also successfully settled numerous cases, for example: *Bryant v. Baltimore Police Department*, No. 1:19-cv-00384 (D. Md.) ($8 million settlement for plaintiff who spent 17 years wrongfully incarcerated before DNA exoneration as a result of police's suppression of exculpatory evidence); *Coley v. Simi Valley* (C.D. Cal.) ($21 million settlement for wrongfully convicted plaintiff who served 39 years in prison for murders of a woman and her 4-year-old son); *Tapp v. City of Idaho Falls*, No. 4:20-cv-00476 (D. Idaho) ($11.7 million settlement in § 1983 wrongful conviction suit); *Berry v. Las Vegas Metro. Police Dep't*, 19-cv-640 (D. Nev.)

($14.5 million settlement in § 1983 wrongful conviction suit); *Saunders v. City of Chicago*, 12-cv-09158 (N.D. Ill.) ($15.99 million total settlements for § 1983 wrongful conviction suit); *Deskovic v. City of Peekskill, et al.,* No. 07-CV-8150 (S.D.N.Y.) (over $23 million in settlements, the largest total settlement amount for a wrongfully convicted individual, for plaintiff wrongly imprisoned for 16 years—from age 16 until he was 32—for a rape and murder he did not commit); *Garcia v. City of New York,* No. 08-CV-04274 (S.D.N.Y.) and *Morillo v. City of New York* (two $7.5 million settlements following plaintiffs' wrongful convictions for murder); *Sterling v. Monroe County, et al.,* No. 11-CV-6217 (W.D.N.Y.) (obtaining $8.625 million in settlement compensation for plaintiff, who served nearly 19 years in prison for a murder he did not commit); *Gonzalez v. City of Waukegan*, No. 16-2906 (N.D. Ill.) ($9.5 million settlement in § 1983 wrongful conviction suit); *Lewis v. City of New Haven*, No. 3:16-cv-1382 (D. Conn.) ($9.5 million settlement in § 1983 wrongful conviction suit); *Courtney v. City of Tulsa*, No. 14-CV-308 (N.D. Okla.) ($8 million settlement in § 1983 wrongful conviction suit); *Allen v. City of St. Louis,* No. 14-CV-01398 (E.D. Mo.) ($14 million settlement in § 1983 wrongful conviction suit); *Mellen v. City of Los Angeles*, No. CV15-03006 (C.D. Cal.) ($12 million settlement for wrongfully convicted plaintiff who served 17 years in prison for murder based on *Brady* violation); *Register v. City of Los Angeles*, No. 14-CV-0568 (C.D. Cal.) ($16.7 million settlement for wrongfully convicted plaintiff who served 34 years in prison for robbery and murder based on witnesses' false identification); *Bivens v. Forrest County*, No. 13-CV-8 (S.D. Miss. 2016) ($16.5 million settlement to the estates of three African-American men coerced into falsely confessing to the 1979 rape and murder of a white woman); *Saunders v. City*

*of Chicago*, 12-cv-09158 (N.D. Ill.) ($15.99 million total settlements for § 1983 wrongful conviction suit); *Lowery v. Riley*, No. 04-CV-03101-JTM (D. Kan.) ($7.5 million wrongful conviction settlement); *Chandler v. Louisville Jefferson County Metro Government*, No. 3:10-CV-470 (W.D. Ky.) ($8.5 million wrongful conviction settlement); and *Gibbs v. City of New York, et al.,* No. 06-CV-5112 (E.D.N.Y.) (obtaining $11.8 million in settlement compensation for plaintiff, who was framed by "Mafia Cop" Louis Eppolito and served 18 years in prison for a murder he did not commit).

17. Due to NSB's recognized expertise in § 1983 wrongful conviction law, we are regularly retained by attorneys throughout the United States, including lawyers from leading law firms, to either act as co-counsel (including acting as lead counsel at trial), or take over litigation of § 1983 wrongful conviction actions. I am personally regularly consulted by other experienced civil rights lawyers on trial strategy.

18. For each of the last eight years, I, along with all the then-current partners at NSB, have been named as a Super Lawyer.

## WORK IN THIS CASE

19. I am seeking compensation for the time I spent on this matter from July 2016 to the present.

20. Over the years of this litigation, my role was as the co-lead counsel on the case. As co-lead counsel, I supervised all aspects of the case's prosecution, including the drafting of the complaint, pre-filing investigation, and preparing Mr. Rosario for his N.Y. Gen. Municipal Law § 50-h examination. I took 10 depositions in this case, including those of 3 Defendants, the

key fact witnesses in the case (Michael Sanchez, Robert Davis and Nicole Torres), and the City's liability expert in eyewitness identifications, whom they subsequently decided not to call at trial after her deposition. I made strategic decisions regarding discovery, as well as at the motion to dismiss and summary judgment phases of the case.

21.     I was co-lead counsel and prosecuted the trial with my partner Emma Freudenberger, and my partners Anna Benvenutti Hoffmann, and Amelia Green. In preparation for the ten-day trial, I worked with the assistance of those partners, and other NSB attorneys and paralegals to outline examinations and evidence for the seventeen witnesses called at trial, and examined six witnesses myself, including Defendant Whitaker, Plaintiff Richard Rosario, and both witnesses that claimed to identify Mr. Rosario as the perpetrator. I oversaw all aspects of trial strategy and presented the closing argument for the case.

22.     I worked closely with Mr. Rosario from the outset, and was the primary lawyer who prepared him for his deposition and trial testimony. Moreover, given his mental health issues, I was required to play a far more hands-on role in preparing and managing Mr. Rosario throughout discovery and trial. In many instances, I was the only attorney who he would communicate with from NSB during mental health crises.

23.     As set forth in the billing records attached as Exhibit B, Chart 1, which come from contemporaneously kept timekeeping logs, I am seeking compensation for a total of 1,010.0 hours in this matter, excluding travel time and work on this fee application.

24.     I have reviewed the attached billing record in its entirety, and made an effort to take a conservative and reasonable approach to the total hours for which I seek compensation. In

my judgment, each hour set forth in Exhibit B, Chart 1 was necessitated by the circumstances and reasonably expended in pursuit of the ultimate favorable outcome in this complicated and important civil rights case.

25. As set forth in the billing records attached as Exhibit B, Chart 2, which come from contemporaneously kept timekeeping logs, I am seeking compensation for a total of 1.5 travel hours in this matter, at 50% of my hourly rate.

26. I have reviewed the attached billing record in its entirety, and made an effort to take a conservative and reasonable approach to the total hours for which I seek compensation. In my judgment, each hour set forth in Exhibit B, Chart 2 was necessitated by the circumstances and reasonably expended in pursuit of the ultimate favorable outcome in this complicated and important civil rights case.

## WORK ON THE FEE APPLICATION

27. I am also seeking compensation for the time I spent on the § 1988 fee application in this case.

28. As co-lead counsel, along with my partners Emma Freudenberger and Anna Benvenutti Hoffmann, my role on the fee application was to provide strategic guidance, to assist in coordinating the collection of a complete set of attorney declarations, to review the expenses, and to review the briefing.

29. As set forth in the billing records attached as Exhibit B, Chart 3, which come from contemporaneously kept timekeeping logs, I am seeking compensation for a total of 12.3 hours on the fee application.

30.     I have reviewed the attached billing record in its entirety, and made an effort to take a conservative and reasonable approach to the total hours for which I seek compensation. In my judgment, each hour set forth in Exhibit B, Chart 3 was necessitated by the circumstances and reasonably expended in pursuit of the ultimate favorable outcome in this complicated and important civil rights case.

**REQUESTED RATE AND FEE AWARD**

31.     As almost all of NSB's work is on a contingency basis on behalf of indigent clients, I rarely bill by the hour.

32.     In 2015, NSB represented a client in a civil rights suit who paid us by the hour for the litigation. The hourly rate I was paid for that work was $650; in addition, NSB was entitled to a percentage of recovery contingent on litigation success.

33.     NSB has rarely had to litigate fee awards, as we have often been able to settle our cases before this point in the litigation, or reach a settlement on the reasonable fees incurred. For example, in 2018, defendants in *Trulove v. D'Amico*, No. 16-cv-00050 (N.D. Cal.) stipulated to an attorneys' fee payment based on time records in which my rate was $800 per hour.

34.     When NSB has litigated fees, we have consistently been awarded rates at the very top of the relevant market. For example, seven years ago, in another § 1983 wrongful conviction suit litigated by NSB, the court found that due to NSB's "particular expertise litigating § 1983 wrongful conviction suits" and that it had "successfully litigated dozens of such cases around the country" it was entitled to the rates requested, up to $700 for senior partners, even though at the

time that exceeded the highest prior hourly rate award in the Southern District. *See Restivo*, 2015 WL 7734100 at *3. I was awarded an hourly rate of $600 at that time.

35. Having been admitted to the New York bar in 1995, and having practiced in New York for twenty-five years and having hired counsel for limited purposes in our cases, I am familiar with the rates commanded by attorneys with similar credentials, skills and experience to me in the New York market. A senior partner, with similar skills, credentials, and experience, working at a firm in the Southern District of New York, regularly charges rates between $1500 and $2000 per hour. Loewenson Decl. ¶ 11.

36. Additionally, I am aware that NSB's rates for senior partners are consistent with those at Emery Celli Brinckerhoff Abady Ward & Maazel, LLP, a civil rights and commercial law firm that charges $900-$950 per hour for senior partners. ECBAWM is the most similar firm to NSB in the New York City market, and as such their rates are a benchmark for the appropriate rates for payment. NSB's rates requested here are aligned with the rates that ECBAWM charges its clients. *See* Freudenberger Decl. Ex. 1, Declaration of Andrew G. Celli, Jr. in Support of Plaintiff's Motion for Attorney's Fees ¶ 12.

37. On behalf of Plaintiffs, I am seeking compensation for my work at a rate of $900 per hour. In my opinion, this requested rate is reasonable in light of the relevant markets and my experience, reputation, and skill.

**EXPENSES INCURRED IN THIS CASE**

38. In addition, NSB has incurred a total of $283,800.99 (*see* Exhibit C, Chart 1, summary chart of expenses) in reasonable out-of-pocket expenses for which I seek

reimbursement on Mr. Rosario's behalf as part of NSB's reasonable fee. This amount does not include additional expenses that NSB incurred in connection with litigating this case, even though NSB advanced those amounts out of pocket. Notably, NSB paid nearly $120,000 to experts, which we do not seek reimbursement for here.

39. While a number of the categories of expenses included in our request here may be separately taxable under 42 U.S.C. § 1920, because they are all also compensable under § 1988, for simplicity, we have included all of our costs in this request.

40. NSB is requesting disbursements in connection with the following categories of expenses: (a) deposition/discovery expenses; (b) investigation fees and expenses; (c) jury consultant fees and expenses; (d) printing, copying and duplication costs; (e) process server fees; (f) records requests and related court fees; (g) shipping costs; (h) transcript costs; (i) travel, car service and meal expenses; (j) trial costs; (k) Westlaw and other research expenses; and (l) witness fees.

41. As described in detail below, each of these categories of expense are of the type normally charged to fee-paying clients.

42. Exhibit C, a record of NSB expenditures for this case, is taken from accounting records contemporaneously maintained by NSB in the ordinary course of business. I have reviewed the expenditures detailed in these records, and rely on those accounting records in making this declaration. The only changes made to the accounting record have been to spell out any abbreviations used, for the sake of clarity; and to sort the expenses into the compensable categories detailed below.

43. Throughout this litigation, Plaintiff has taken a conservative and reasonable approach to the expenses and costs incurred. NSB has carried and continues to carry the majority of the costs of this litigation, over its nearly 5-year lifespan. Therefore, we have placed a particular emphasis on limiting expenditures to those that were reasonable and necessary in pursuit of the ultimate favorable outcome in this complicated and important civil rights case. We consistently and constantly shop around for vendors, get competitive pricing, and otherwise make every effort to limit expenses incurred wherever possible.

44. All expenses were necessarily incurred in the course of this litigation.

### A.     *Deposition/Discovery Expenses*

45. NSB requests a total of $60,008.71 for deposition costs. Attached as Exhibit C, Chart 2 is an itemized record of NSB expenditures for deposition costs.

46. The requested deposition costs include both transcript and court reporter charges, as well as videotaping service charges. These deposition charges were necessary, as demonstrated by their use in support of Plaintiff's opposition to summary judgment and/or as impeachment material or in lieu of live witness testimony at trial in this case.

47. NSB regularly shopped around and negotiated the cost of court reporter services, deposition transcripts, and videotaping services with outside vendors. Specifically, at the outset of discovery, NSB had a paralegal contact a number of court reporting vendors and videographers to obtain bids and negotiated, where possible, for discounted rates based on the number of depositions that were set to be taken.

### B. Investigation Costs

48. NSB requests a total of $34,979.29 for investigation costs. Attached as Exhibit C, Chart 3 is an itemized record of NSB expenditures for investigation costs.

49. The requested investigation costs reflect fees for investigative services, spanning six years of representation, and including locating and interviewing witnesses and records.

50. NSB regularly negotiated the cost associated with all investigation, and ensured that these expenses were limited to those necessary to prosecution of this action. Specifically, in instances where paralegals could accomplish an investigative task at a lesser expense, NSB chose to have the paralegal carry out that investigative task.

### C. Jury Consultant Expenses

51. NSB requests a total of $88,831.00 for Plaintiff's jury consultant. Attached as Exhibit C, Chart 4 is an itemized record of NSB expenditures for the jury consultant.

### D. Printing, Copying & Duplication Costs

52. NSB requests a total of $18,334.00 for in-house printing, copying and duplication costs.

53. Attached as Exhibit C, Chart 5 is an itemized record of NSB expenditures for copying and duplication by outside vendors.

54. NSB has utilized the same internal copying and printing tracking system since this case began. Under NSB's system, each case is assigned an accounting number, and every copy or print job requires entry of the appropriate case accounting number before the job can be completed. The accounting number for Mr. Rosario's § 1983 suit has been the same throughout

the life of the case. These in-house records were generated automatically by requesting a computerized report for copying charges associated with the Rosario § 1983 suit's accounting number.

### E. Process Server Fees

55. NSB requests a total of $2,830.57 for Plaintiff's process servers. Attached as Exhibit C, Chart 6 is an itemized record of NSB expenditures for the process servers used by NSB.

### F. Records Requests and Related Court Fees

56. NSB requests a total of $789.20 for Plaintiff's records requests and related court fees. Attached as Exhibit C, Chart 7 is an itemized record of NSB expenditures for the records requests and related court fees paid by NSB.

### G. Shipping Costs

57. NSB requests a total of $1,044.83 for postage and shipping costs. Attached as Exhibit C, Chart 8 is an itemized record of NSB expenditures for postage and shipping costs.

58. The requested shipping costs include both courier services (including UPS and FedEx) and United States Postal Service postage charges, which are recorded as postage reimbursements. These shipping charges included charges for serving documents, mailing letters to the Court, and corresponding with experts and opposing counsel.

59. Throughout the litigation, NSB chose the most economical shipping method available given the legal requirements for the shipment. Where shipping could be accomplished by United States Postal Service first-class mail and did not require a return receipt or to be

shipped by certified mail, NSB chose that method of shipment; NSB has not requested reimbursement for any United States Postal Service first-class mail shipping.

### H. Transcript Costs

60. NSB requests a total of $8,865.37 for transcript costs. Attached as Exhibit C, Chart 9 is an itemized record of NSB expenditures for transcripts.

61. The requested transcript costs include transcript of the trial, which was used in the prosecution of Mr. Rosario's claims.

### I. Travel Costs

62. NSB requests a total of $45,504.69 for travel costs. Attached as Exhibit C, Chart 10 is an itemized record of NSB expenditures for travel costs.

63. The requested travel costs include expenses for witnesses to attend depositions, and transportation costs related to trial. These travel charges were necessarily incurred in the course of this litigation.

64. NSB regularly shopped around for the lowest available rates for airfare and lodging, and generally ensured that these expenses were limited to those necessary to prosecution of this action.

65. For example, in securing lodging for Mr. Rosario and witnesses for the trial, NSB had a paralegal shop each of the hotels in downtown Manhattan and negotiate rates before booking.

### J.   Trial Costs

66. NSB requests a total of $9,459.08 for trial costs. Attached as Exhibit C, Chart 11 is an itemized record of NSB expenditures for trial costs.

67. The requested trial costs include costs associated with the presentation of exhibits and video deposition testimony at trial, as well as typical out-of-pocket trial expenses, such as office supplies.

68. NSB regularly negotiated the cost associated with each of these expenditures with outside vendors, and ensured that these expenses were limited to those necessary to prosecution of this action.

### K.   Westlaw/Research Charges

69. NSB requests a total of $13,417.48 for research charges, as reflected in Exhibit C, Chart 12, reflecting billing records generated by Westlaw for our work in this case and organized chronologically.

### L.   Witness Fees

70. NSB requests a total of $736.77 for witness fees. Attached as Exhibit C, Chart 13 is an itemized record of NSB expenditures for witness fees.

71. The requested witness fees include the statutory per diem for attendance of $40 per day, plus any mileage fees, for depositions and the first and second trial. These witness fee charges were necessarily incurred in the course of this litigation.

I declare the foregoing to be true under the penalty of perjury.

Dated: October 7, 2022
New York, NY

                                                    <u>/s/Nick J. Brustin</u>
                                                    Nick J. Brustin